UNITED STATES, Appellee

v.

Michael E. SULLIVAN, Captain
U.S. Coast Guard, Appellant

No. 15-0186

Crim. App. No. 001-69-13

United States Court of Appeals for the Armed Forces

Argued May 12, 2015

Decided August 19, 2015

OHLSON, J., delivered the opinion of the Court, in which BAKER, STUCKY and RYAN, JJ., joined.  ERDMANN, C.J., filed a separate opinion concurring in part and dissenting in part.

Counsel

For Appellant:  Eugene R. Fidell, Esq. (argued); Lieutenant Philip A. Jones (on brief).

For Appellee:  Lieutenant Commander Amanda M. Lee (argued).


Military Judge:  Gary E. Felicetti


**This opinion is subject to revision before final publication.**

United States v. Sullivan, No. 15-0186/CG

Judge OHLSON delivered the opinion of the Court.*

A general court-martial composed entirely of captains convicted Appellant, a captain in the United States Coast Guard with more than twenty-seven years of service, of wrongful use of cocaine in violation of Article 112a, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 912a (2006). The court-martial panel had no flag officers[1] because the convening authority categorically excluded all such officers from the member pool in violation of Article 25, UCMJ, 10 U.S.C. § 825. In addition, the military judge acknowledged that he had prior relationships, both professional and social, with a significant number of the court-martial participants, but he declined to disqualify himself from presiding over the trial.

We granted Appellant's petition for review on the following two issues:

> I.  WHETHER THE GOVERNMENT CARRIED ITS BURDEN OF PROVING THAT THE CONVENING AUTHORITY'S CATEGORICAL EXCLUSION OF ALL FLAG OFFICERS WAS HARMLESS.

> II.  WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION IN DENYING CHALLENGES FROM BOTH PARTIES TO HIS IMPARTIALITY BASED ON PRIOR PERSONAL RELATIONSHIPS WITH INDIVIDUAL MILITARY COUNSEL, THE ACCUSED, TRIAL COUNSEL, SEVERAL MEMBERS, SEVERAL WITNESSES, AND THE STAFF JUDGE ADVOCATE.

---

*Former Chief Judge James E. Baker took final action in this case prior to the expiration of his term on July 31, 2015.
[1] A flag officer is an officer of the "Coast Guard serving in or having the grade of admiral, vice admiral, rear admiral, or rear admiral (lower half)."  10 U.S.C. § 101(b)(5) (2012).

Upon analyzing these issues, we conclude that under the particular circumstances of the instant case, the convening authority's exclusion of flag officers from the member pool was harmless.  We further conclude that the military judge's decision not to disqualify himself did not constitute an abuse of discretion.  Accordingly, we hold that Appellant is not entitled to relief.

## I.   BACKGROUND

In June 2008, Appellant tested positive for cocaine pursuant to a random urinalysis.  Subsequent tests of Appellant's hair confirmed the presence of cocaine.  A general court-martial was convened and at trial Appellant claimed that his positive drug test stemmed from his wife's admitted use of cocaine in their household.  Contrary to his plea, however, the panel convicted Appellant of the cocaine use offense[2] and sentenced him to a fine of $5,000 and a reprimand, which the convening authority then approved.  The acting Judge Advocate General of the Coast Guard (TJAG) referred this case to the United States Coast Guard Court of Criminal Appeals (CCA) for review pursuant to Article 69(d), UCMJ, 10 U.S.C. § 869(d).  The CCA affirmed the findings and sentence.

---

[2] Appellant was acquitted of a charge and specification of conduct unbecoming an officer and a gentleman, in violation of Article 133, UCMJ, 10 U.S.C. § 933.

## II. SELECTION OF MEMBERS

### A. Facts

The panel in Appellant's case was selected from a ten-person venire that was composed entirely of captains who had served for at least twenty-seven years in the Coast Guard. Because of the omission of flag officers from the member pool, Appellant moved to dismiss his case for a violation of Article 25, UCMJ.

The military judge denied the motion because he was not convinced that "the convening authority's effort to pick officers who might actually be able to serve on the court [was] improper." He based this conclusion on the following findings: (1) the convening authority had been advised of the Article 25, UCMJ, selection criteria at least six times in writing and twice verbally; (2) the convening authority had determined that the flag officers were not available based on his "personal experience" and "general knowledge" of flag officers' duties and schedules; (3) the convening authority had not inquired "into the availability of any particular flag officer"; and (4) the convening authority had not attempted to "stack the court with post-continuation" captains,[3] but instead "was motivated by a

---

[3] A post-continuation captain is an officer who has not been selected for promotion to rear admiral but has been selected to continue service as a captain with the Coast Guard. See 14 U.S.C. § 289(a). Those captains considered, but not selected, for continuation must retire. Id. § 289(g).

desire to select members who" were qualified and who were available to "actually serve on the panel." The military judge also found that the convening authority "did not categorically exclude all flag officers [from] consideration."

On appeal the CCA concluded that the military judge clearly erred in finding that the convening authority had not categorically excluded flag officers from the venire panel, and further concluded that this exclusion violated Article 25, UCMJ. However, the CCA determined that the Government had established that this exclusion was harmless, and it otherwise adopted the military judge's factual findings.

B. Standard of Review

We review "claims of error in the selection of members of courts-martial de novo as questions of law." United States v. Bartlett, 66 M.J. 426, 427 (C.A.A.F. 2008). We also conduct a de novo review to determine whether an error in member selection is harmless. See United States v. Ward, 74 M.J. 225, __ (7) (C.A.A.F. 2015).

C. Discussion

The Government has not challenged the CCA's holding that the convening authority's categorical exclusion of flag officers from the member pool violated Article 25, UCMJ. See United States v. Kirkland, 53 M.J. 22, 24 (C.A.A.F. 2000); United States v. Nixon, 33 M.J. 433, 435 (C.M.A. 1991) ("[M]ilitary

grade by itself is not a permissible criterion for selection of court-martial members."); see also Article 25(a), (d)(2), UCMJ. Appellant raises two theories for reversal because of this categorical exclusion: (1) the exclusion created an appearance of unfairness; and (2) the Government did not meet its burden of establishing the exclusion was harmless. We address each argument in turn.

First, there is no appearance of an unfair panel in this case. Although the convening authority deviated from the Article 25, UCMJ, criteria by categorically excluding flag officers from the venire panel, he provided Appellant with a venire of fellow senior captains who were fully qualified to sit on a court-martial panel. Indeed, we find no basis to conclude that the convening authority selected the members on any factors other than their "age, education, training, experience, length of service, and judicial temperament." Article 25(d)(2), UCMJ. Further, the record provides no indication that these panel members failed to fully, carefully, and appropriately consider Appellant's case in arriving at a verdict and sentence. Moreover, the convening authority's motivation in excluding flag officers from this case was not to stack the panel against Appellant. Rather, the convening authority relied on his experience in concluding that the flag officers would not be

United States v. Sullivan, No. 15-0186/CG

available to actually sit on the panel and hear the case.[4]

United States v. Gooch, 69 M.J. 353, 358 (C.A.A.F. 2011).  Based

on these circumstances, we conclude that there was no appearance

of unfairness.

Second, the Government has met its burden of establishing

that the categorical exclusion of flag officers was harmless.

See Ward, 74 M.J. at __ (9) (noting Government has burden of

showing Article 25, UCMJ, violation was harmless).  As discussed

above, the convening authority's motivation in excluding the

flag officers was based on his belief that they would be

unavailable to actually serve on the court-martial.  See

Bartlett, 66 M.J. at 430 (evaluating convening authority's

motivation in determining harmlessness).  Further, the selected

members, all of whom were captains, met the Article 25, UCMJ,

criteria.  See id. (examining whether selected members met

Article 25, UCMJ, criteria).  Finally, the members' actions in

this case demonstrate that they were fair and unbiased.  See

Gooch, 69 M.J. at 361 (noting fairness and impartiality of

members in evaluating for harmlessness).  This point is

underscored by the fact that the members stated that they would

be impartial during voir dire; they were active participants

---

[4] We note that instead of relying on his experience in concluding
that all of the flag officers would not be available to serve on
the panel, the convening authority should have made
individualized inquiries on this point.

throughout the trial who posed unbiased questions during the course of the trial; they deliberated over the course of three days before rendering a verdict, which included an acquittal of one charge; and they imposed a lenient sentence. In light of these factors, we conclude that the Government has met its burden of establishing that the categorical exclusion of flag officers was harmless.[5]

Because we find no reversible error with respect to the member selection issue, we next examine whether the military judge should have disqualified himself from presiding at Appellant's trial because of his various connections to a number of the court-martial participants.

### III. THE MILITARY JUDGE

#### A. Facts

At the time of Appellant's trial, the Coast Guard only had one military judge certified to preside over general courts-martial. This military judge served as the Chief Trial Judge of the Coast Guard, had attained the rank of captain, and had

---

[5] Although the Government has the burden with respect to harmlessness, we consider, and reject, Appellant's allegation that there was prejudice due to the members being in the same promotion pool as Appellant. This allegation is speculative because the trial record does not reveal that the members acted with any improper motive. See Bartlett, 66 M.J. at 431 n.4 (rejecting the appellant's argument for prejudice in member selection case as "speculative at best"). This allegation therefore does not demonstrate that the Government failed to meet its burden.

almost twenty-eight years of commissioned service in the Coast Guard.

As the military judge noted in his findings of fact, the Coast Guard is a "small service with a much smaller legal community. A large percentage of its commissioned officers, particularly at the more senior levels, attended the Coast Guard Academy." Indeed, the tight-knit nature of the Coast Guard is reflected in the significant number of relationships that the military judge in the instant case had with various participants in the court-martial process, as reflected below.

First, the military judge knew Appellant and his wife. More than twenty years before trial, Appellant and the military judge were stationed at the same Coast Guard facility, and Appellant and his wife socialized with a group of junior officers that included the military judge. However, the military judge had not had any contact with Appellant or his wife for more than twenty years.

Second, the military judge supervised the individual military defense counsel (IMC) for one year in 2002, which was seven years before Appellant's trial. During this supervisory relationship, the military judge and the IMC had dinner at each other's homes once each. The military judge and the IMC also had a few professional contacts regarding organizational or management issues subsequent to this supervisory relationship.

It should also be noted that, after the IMC was detailed to the instant case, he sought to resume his prior status as a collateral duty special court-martial military judge in early 2009. However, although the military judge, as the chief trial judge, ordinarily would make recommendations about the special court-martial judges, he recused himself from the IMC's request.

Third, the staff judge advocate (SJA) to the convening authority was serving as a collateral-duty special court-martial military judge. As the chief trial judge in the Coast Guard, the military judge had "managerial oversight" of the SJA in the SJA's capacity as a military judge. The military judge also knew of the SJA through conferences, trainings, and meetings.

Fourth, the military judge and trial counsel had professional contacts stemming from a different court-martial. The military judge described his professional relationship with trial counsel as "some very limited involvement in a contested members case."

Fifth, the military judge also had a professional relationship with the senior assistant trial counsel (ATC) concerning the ATC's role as Chief of the Office of Military Justice at Coast Guard Headquarters who had the primary responsibility for military justice policy. At the time of Appellant's trial, this office was in the process of revising the Coast Guard's military justice manual. The military judge

had suggested changes to the manual, but he did not discuss Appellant's case with the ATC and instead directed his comments to the ATC's deputy once he learned of the ATC's role in this case.

Sixth, the military judge had "professional and work-related social contacts" with CAPT Kenney, a defense witness and the initial defense counsel, beginning in 2004. The military judge's most frequent contacts with CAPT Kenney occurred between 2006 and 2008 when CAPT Kenney was a field SJA and the military judge was the Chief of the Office of Legal Policy & Program Development at Coast Guard Headquarters (LPD), the position that CAPT Kenney transferred to following the military judge's departure. As the Chief of the LPD, the military judge's job was to support the field SJAs, which meant he spent "a lot of time on the phone" with SJAs, including CAPT Kenney. The military judge also was in charge of assignments, which led to discussions with CAPT Kenney about the needs of the SJA office and CAPT Kenney's own assignments. The military judge encouraged CAPT Kenney to replace him as the Chief of the LPD and made a recommendation to this effect. Since the parties did not inform the military judge about CAPT Kenney's role as a fact witness in this case until late March 2009, the military judge's professional contacts with CAPT Kenney lasted through February 2009 and concerned the selection of new collateral duty special

11

court-martial military judges.  However, the military judge and CAPT Kenney never discussed Appellant's case.

Seventh, the military judge had relationships with other court-martial participants and potential witnesses that arose from the military judge's attendance at the Coast Guard Academy in the late 1970s and early 1980s and/or from his professional duties during his lengthy service in the Coast Guard.

Eighth, the military judge's direct supervisor was TJAG. The military judge never discussed particular cases with TJAG, including this case.  However, the military judge contacted the deputy judge advocate general (DJAG) during Appellant's case so that DJAG would give TJAG "a heads-up" about being a potential witness for motions in this case.  The military judge explained that his contact with DJAG was "[j]ust a courtesy" to notify TJAG about the situation.  The military judge stated he would not have done this for another witness because he did not "work for any other witness."

Ninth, certain individuals detailed to the original or amended member pools also knew the military judge as a classmate at the Coast Guard Academy and/or through working relationships. One of these members stated that his prior association with the

12

military judge would keep him from following the military judge's instructions.[6]

Because of the members' familiarity with him, the military judge stated that he understood "the government's concern with getting members who [could] . . . follow [his] instructions as they're required to do."  To try to alleviate this concern and to help the Government assemble a panel, the military judge stated that he would "try to find a senior judge from another service."  Regarding this point, the military judge had the following exchange with the IMC:

> IMC:  If I may ask a question, sir.  Maybe I just don't get it, but why would you do that?
>
> [Military Judge]:  As a matter of convenience for the -- essentially, I guess, the government, who has to produce a panel.
>
> IMC:  Because of the concern that they would not be able to produce enough people based on some of the arguments that came up here today, because of [the] relationship with you or [the] perceived relationship with you?
>
> [Military Judge]:  Whatever their concerns are -- and you've articulated concerns too.  Again, it would be a matter of convenience to say, you know what, we think, if you have this, then it makes . . . our life easier.

The military judge later informed the parties that his inquiries for a replacement military judge ultimately "didn't

---

[6] This individual ultimately was not selected as part of the final member pool.  It is unclear from the record whether his response to this question was a typographical error.

pan out" due to issues with "the motions practice, the posture and the timing."

The Government, with Appellant's concurrence, filed a "Motion for Recusal of the Military Judge." The Government's request was based on an appearance of bias stemming from the military judge's relationships with various court-martial participants. Appellant agreed with the Government's motion and, in a separate filing, noted that this appearance of bias was exacerbated by the fact that the military judge was in the same promotion zone as Appellant, this case had high visibility, and TJAG was the military judge's direct supervisor.

After an extensive proffer by the military judge and a colloquy between the military judge and the parties, the military judge denied the motion for disqualification. The military judge explained that his prior relationships with a number of the court-martial participants did not raise an appearance of bias because the "vast majority" of contacts occurred at routine work-related events and the social contacts were minimal and distant in time. He also stated that the issue of competing with Appellant for a promotion was "illusory," and he noted that he had "more prior contacts with the [d]efense side" than with the Government side.

United States v. Sullivan, No. 15-0186/CG

B.  Standard of Review

Our review of a military judge's disqualification decision is for an abuse of discretion.  United States v. McIlwain, 66 M.J. 312, 314 (C.A.A.F. 2008); United States v. Quintanilla, 56 M.J. 37, 77 (C.A.A.F. 2001).  A military judge's ruling constitutes an abuse of discretion if it is "arbitrary, fanciful, clearly unreasonable or clearly erroneous," not if this Court merely would reach a different conclusion.  United States v. Brown, 72 M.J. 359, 362 (C.A.A.F. 2013) (internal quotation marks and citation omitted).

Appellant does not claim that the military judge in his case was actually biased, only that the military judge's presence raised an appearance of bias under Rule for Courts-Martial (R.C.M.) 902(a).[7]  We apply an objective standard for identifying an appearance of bias by asking whether a reasonable person knowing all the circumstances would conclude that the military judge's impartiality might reasonably be questioned. Hasan, 71 M.J. at 418.  Recusal based on an appearance of bias "is intended to 'promote public confidence in the integrity of the judicial process.'"  Id. (quoting Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 858 n.7 (1988)).  However, this "appearance standard does not require judges to live in an

---

[7] This rule states:  "A military judge shall disqualify himself . . . in any proceeding in which that military judge's impartiality might reasonably be questioned."  R.C.M. 902(a).

15

United States v. Sullivan, No. 15-0186/CG

environment sealed off from the outside world." United States

v. Butcher, 56 M.J. 87, 91 (C.A.A.F. 2001).  Although a military

judge is to "broadly construe" the grounds for challenge, he

should not leave the case "unnecessarily."  R.C.M. 902(d)(1)

Discussion.

   C.  Overview

   As can be seen by the facts recited above, the military

judge had professional and/or social contacts with a significant

number of the court-martial participants in this case.  Under

these circumstances it could fairly be argued that the military

judge should have disqualified himself out of a sense of

prudence.[8]  However, as also noted above, that is not the

standard of review we are obligated to apply in deciding such

cases on appeal.  Rather, we are required to apply an abuse of

discretion standard in determining whether the military judge's

decision not to disqualify himself was error.

   In analyzing this issue, we note at the outset the

following points:  the military judge fully disclosed his

relationships with the participants in the court-martial; the

record reveals no evidence of any actual bias on the part of the

military judge, or of any other actions or rulings by the

---

[8] Cf. United States v. Gorski, 48 M.J. 317 (C.A.A.F. 1997)
(noting in a memorandum opinion by Judge Effron that when
recusal is interjected into the proceedings and recusal is not
required as a matter of law, a judge must still decide if
recusal is appropriate as a matter of discretion).

16

military judge that would independently raise appearance issues;

and the military judge fully heard the views of both parties on

this issue and then affirmatively stated on the record that he

could remain impartial to both sides.  Accordingly, under these

particular circumstances we conclude that the military judge's

disqualification decision was not "arbitrary, fanciful, clearly

unreasonable, or clearly erroneous."  Brown, 72 at 362 (internal

quotation marks and citation omitted).

D.  Discussion

We find no abuse of discretion in the military judge's

failure to disqualify himself for the following reasons.  First,

the military judge specifically stated on the record that none

of his associations with court-martial participants would

influence any of his decisions in Appellant's case.  See United

States v. Wright, 52 M.J. 136, 141 (C.A.A.F. 1999) ("[D]espite

an objective standard, the judge's statements concerning his

intentions and the matters upon which he will rely are not

irrelevant to the inquiry.").

Second, Appellant has not identified any conduct by the

military judge which tends to demonstrate that he

inappropriately influenced the panel in this case.  Indeed, the

panel's active participation, lengthy deliberations, and lenient

sentence seem to underscore the point that they acted

independently in this matter.

Third, although the military judge had to resolve a number of pretrial motions, Appellant has not pointed to any rulings that raise appearance concerns.

Fourth, we note that "[p]ersonal relationships between members of the judiciary and witnesses or other participants in the court-martial process do not necessarily require disqualification." Norfleet, 53 M.J. at 270. Further, "a former professional relationship is not per se disqualifying." Wright, 52 M.J. at 141.

Here, the military judge was forthcoming and catalogued his relationships with the participants in the trial and subjected himself to voir dire on this subject. As the summary of these relationships outlined above demonstrates, most of the military judge's contacts were professional and routine in nature. Further, although "a social relationship creates special concerns," those relationships that had a social component occurred years prior to the court-martial and were not close or intimate. Cf. United States v. Sherrod, 26 M.J. 30, 31 & n.2 (C.M.A. 1988) (agreeing with lower court that military judge was disqualified where victim was a close friend of the military judge's thirteen-year-old daughter with whom the military judge had socialized); United States v. Berman, 28 M.J. 615, 618 (A.F.C.M.R. 1989) (en banc) (finding intimate relationship between military judge and trial counsel in appellants' courts-

martial required disqualification).  In regard to the military judge's decision to notify DJAG that TJAG might by a witness for some motions in this case, although this step may have been ill-advised, we find an insufficient basis to conclude that it reasonably brought into question the military judge's impartiality.

We note that in certain circumstances, the cumulative nature of a military judge's relationships can create an appearance issue.  See United States v. DeTemple, 162 F.3d 279, 287 (4th Cir. 1998) ("[A] confluence of facts [may] create a reason for questioning a judge's impartiality, even though none of those facts, in isolation, necessitates recusal."); see also United States v. Amico, 486 F.3d 764, 776 (2d Cir. 2007) (noting that recusal is warranted when "in the aggregate, the [circumstances of the case] would lead a disinterested observer to conclude that the appearance of partiality existed"). However, in the instant case the number and type of contacts that the military judge had with the participants in the court-martial appear to simply be the natural consequence of the military judge's length of service in the relatively small Coast Guard, and we do not find a sufficient basis to conclude that a reasonable person familiar with all the circumstances in this case would conclude that the "military judge's impartiality might reasonably be questioned."  R.C.M. 902(a); see DeTemple,

162 F.3d at 287 ("'[O]ther things being equal, the more common a potentially biasing circumstance and the less easily avoidable it seems, the less that circumstance will appear to a knowledgeable observer as a sign of partiality.'" (quoting In re Allied-Signal Inc., 891 F.2d 967, 971 (1st Cir. 1989))).

Appellant cites three circumstances of this case that, in his view, serve to increase the appearance of bias. Appellant first argues that the military judge and Appellant were both captains subject to promotion, and thus were in competition with one another for one of the coveted flag officer slots. However, the military judge "disclaimed" any potential conflict, and noted that as a judge advocate, he would not be in competition for the same promotion as Appellant who was not a judge advocate. We agree with the military judge that this potential promotion conflict was "illusory" and did not create an appearance of bias.

Appellant next contends that the parties' joint request for disqualification demonstrates that the circumstances of the case raised an appearance of bias problem. We agree that the parties' joint request did provide support for disqualification under R.C.M. 902(a) because a "disinterested observer would have noted that the government joined the [accused's] motions for recusal -- a very unusual development demonstrating that all parties were seriously concerned about the appearance of

partiality." Amico, 486 F.3d at 776. Indeed, we caution military judges to be especially circumspect in deciding whether to disqualify themselves in such instances. Nevertheless, after considering the circumstances surrounding the basis for the disqualification request in the instant case, we again do not find an adequate basis to conclude that the military judge abused his discretion when he decided not to disqualify himself.

Appellant finally argues that under McIlwain, the military judge's statement about inquiring into the availability of a military judge from another military service is evidence that the military judge himself recognized that there was an appearance of bias. In McIlwain, we found that the military judge abused her discretion in not disqualifying herself because she stated: "[H]er participation would suggest to an impartial person looking in that I can't be impartial in this case." 66 M.J. at 314 (internal quotation marks omitted). However, the military judge's statements in this case about inquiring into the availability of a military judge from another armed service are distinguishable from those in McIlwain. Specifically, these statements were meant to address the Government's concern about the efforts they would have to undertake to assemble an impartial member pool, which deals with an issue of member bias, not military judge bias. Further, unlike the military judge in

<u>McIlwain</u>, the military judge in Appellant's case specifically

rejected the notion that there was an appearance problem:

> [D]o I believe [the multiple relationships with court-
> martial participants] creates an appearance of bias or
> impartiality in favor or against the accused?  No, I
> don't.  I mean obviously I would have disqualified
> myself if I did.

Thus the military judge's statement regarding inquiring

about military judge availability from other armed services does

not conclusively raise any appearance of bias concerns.

We therefore conclude that under the circumstances of

Appellant's case, the military judge acted within his discretion

in finding that his various relationships with court-martial

participants did not constitute a basis for disqualification.

CONCLUSION

We conclude that neither the manner of the member selection

nor the presence of the military judge in this case warrants

reversal.  The decision of the United States Coast Guard Court

of Criminal Appeals is therefore affirmed.

ERDMANN, Chief Judge (concurring in part and dissenting in part):

I concur with the majority's decision on Issue I, that under our precedent, the violation of Article 25, UCMJ, was harmless. However, I respectfully dissent from its determination that the military judge did not abuse his discretion when he denied the motions of both parties to recuse himself. The military judge in this case had a personal or professional relationship with nearly everyone involved in the court-martial process, to include the Staff Judge Advocate who advised the convening authority, the Article 32 hearing officer, the trial counsel, the assistant trial counsel, the defense counsel, three defense witnesses, the Judge Advocate General (TJAG) (his supervisor and a potential witness), the panel members, and the accused himself. Additionally, the military judge found himself in the same promotion pool as the accused. At some point, too much is simply too much.

Sullivan argues that in light of these facts, the military judge's failure to recuse himself resulted in an appearance of bias. This is an issue we have addressed many times.

> In the military context, the appearance of bias principle is derived from R.C.M. 902(a): "A military judge shall disqualify himself . . . in any proceeding in which that military judge's impartiality might reasonably be questioned." The standard for identifying the appearance is objective: "[a]ny conduct that would lead a reasonable man knowing all

the circumstances to the conclusion that the judge's impartiality might reasonably be questioned." Kincheloe, 14 M.J. at 50 (alteration in original) (internal quotation marks omitted).  As in the civilian context, recusal based on the appearance of bias is intended to "promote public confidence in the integrity of the judicial process."  Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 858 n.7 (1988).  "[W]hat matters is not the reality of bias or prejudice but its appearance."  Liteky v. United States, 510 U.S. 540, 548 (1994).  In the military justice system, where the charges are necessarily brought by the commander against subordinates and where, pursuant to Article 25, UCMJ, 10 U.S.C. § 825 (2006), the convening authority is responsible for selecting the members, military judges serve as the independent check on the integrity of the court-martial process.  The validity of this system depends on the impartiality of military judges in fact and in appearance.

Hasan v. Gross, 71 M.J. 416, 418-19 (C.A.A.F. 2012).

As noted by the majority, at the time of Sullivan's trial, the military judge was the only member of the United States Coast Guard authorized to preside over general courts-martial. It appears this situation is due to the Coast Guard's relatively small active-duty size.  Nevertheless, "'[a]n accused has a constitutional right to an impartial judge,'" United States v. Martinez, 70 M.J. 154, 157 (C.A.A.F. 2011) (citation omitted), and there exists no exception for the Coast Guard because of its small size.  This, of course, is because

[t]he neutrality [of an impartial judge] required by constitutional due process

helps to guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts or

2

> the law.  At the same time, it preserves both the
> appearance and reality of fairness . . . .
>
> . . . .
>
> The appearance standard helps to enhance confidence in
> the fairness of the proceedings because in matters of
> bias, the line between appearance and reality is often
> barely discernible.

United States v. Butcher, 56 M.J. 87, 90 (C.A.A.F. 2001)

(citation omitted).

Certainly "[p]ersonal relationships between members of the

judiciary and witnesses or other participants in the court-

martial process do not necessarily require disqualification."

United States v. Norfleet, 53 M.J. 262, 270 (C.A.A.F. 2000).

Nevertheless, it remains important to remember that "the

interplay of social and professional relationships in the armed

forces poses particular challenges for the military judiciary."

Butcher, 56 M.J. at 91.  These challenges exist whether the case

is tried before members or before a military judge alone.  See

United States v. McIlwain, 66 M.J. 312, 314 (C.A.A.F. 2008)

("[I]f a judge is disqualified to sit as a judge alone, [s]he is

also disqualified to sit with members.") (alteration in

original) (internal quotation marks and citation omitted).  This

is because it "is well-settled in military law that the military

judge is more than a mere referee."  Id.

Unlike previous cases we have considered, the military

judge in this case had a personal or professional relationship

3

with virtually every individual involved in the court-martial process.  The military judge recognized that these relationships were significant when he spent eighteen pages of the record listing them.  Then, in response to written questions posed by the government, the military judge continued on the record for approximately fourteen more pages.  For the next thirty-five pages, the government and the defense verbally voir dired the military judge.  At the conclusion of voir dire, both parties had sufficient concerns that they moved for the military judge to recuse himself.

The voir dire also revealed a situation involving the relationship between the military judge and the Coast Guard TJAG.  The military judge reported directly to TJAG, who signed the military judge's performance report.  When it appeared that TJAG might be called as a witness, the military judge made a call to the Deputy Judge Advocate General (DJAG) to give TJAG a "heads-up."  When asked by the defense whether the military judge would have done that for any other witness, the military judge replied "[p]robably not, because I don't work for any other witness."  Also of concern to an objective observer is the fact that the military judge was in the same promotion pool as Sullivan.[1]

---

[1] While there is conflicting evidence regarding whether Sullivan would remain in the promotion pool during the court-martial,

Despite all of this, the military judge failed to recognize that these multiple relationships would lead a reasonable person, knowing all the circumstances, to the conclusion that the military judge's impartiality might reasonably be questioned. United States v. Kincheloe, 14 M.J. 40, 50 (C.M.A. 1982). Instead, he stated he would seek out other potential military judges from the sister services "as a matter of helping both sides [to] find it easier to pick a court-martial panel" and as "a matter of convenience." When asked by the defense why the military judge would do so if he did not believe there was a problem, the military judge reiterated that it was a matter of convenience.[2] Under these circumstances a reasonable person, knowing all the circumstances, might harbor doubts about military judge's impartiality. See Martinez, 70 M.J. at 158; Butcher, 56 M.J. at 91.

---

assuming he was temporarily removed from the pool for the pendency of the court-martial, a conviction would remove him from the pool permanently.

[2] While the military judge indicated that he would pursue this informal attempt to remedy the situation, his efforts apparently failed due to his insistence that the new military judge be available for trial on certain dates. However, "[o]nce recused, a military judge should not play any procedural or substantive role with regard to the matter about which he is recused." United States v. Roach, 69 M.J. 17, 20 (C.A.A.F. 2010); see also Walker v. United States, 60 M.J. 354, 358 (C.A.A.F. 2004) ("When a judge is recused, the judge should not take action to influence the appointment of his or her replacement."). In other words, any new judge appointed would be responsible for determining an appropriate trial date.

That said, this court has also "recognized that not every judicial disqualification error requires reversal and has adopted the standards the Supreme Court announced in <u>Liljeberg v. Health Services Acquisition Corp.</u>, 486 U.S. 847, 864 (1988), for determining whether a judge's disqualification under 28 U.S.C. § 455(a) (2000), warrants a remedy." <u>McIlwain</u>, 66 M.J. at 315. The <u>Liljeberg</u> factors include: "1) the risk of injustice to the parties, 2) the risk that the denial of relief will produce injustice in other cases, and 3) the risk of undermining public confidence in the judicial process." <u>Id.</u>

It is the third <u>Liljeberg</u> factor that is relevant to this inquiry. Is there a risk of undermining the public's confidence in the military justice system where the judge knows almost everyone in the proceeding, is in the same promotion pool as the accused, and has contacted his boss, who was a potential witness, to give him a "heads-up"? I believe there is. Adding to the lack of public confidence is that the matter could have been resolved by making a formal request for a military judge to the Judge Advocate General of a sister service. <u>See</u> Rule for Courts-Martial 503(b)(3). The failure to remedy the issue when it was relatively easy to do so could only create additional doubt in the public's mind.[3]

---

[3] Another way of looking at the issue is to consider whether a military judge in another service, without the size constraints

For these reasons I believe that a reasonable person, knowing all the circumstances, might reasonably question the military judge's impartiality.  Consequently, the military judge's failure to recuse himself undermined public confidence in the integrity of the military justice system.  Accordingly, I respectfully dissent from the majority as to Issue II.

---

of the Coast Guard, would have recused him/herself under similar circumstances.