*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps Court of Criminal Appeals

Before
GASTON, HOUTZ, and MYERS
Appellate Military Judges

———————————

**UNITED STATES**
*Appellee*

**v.**

**Ethan R. SHIELDS**
Staff Sergeant (E-6), U.S. Marine Corps
*Appellant*

**No. 202100061**

———————————

Argued: 21 June 2022 – Decided: 27 July 2022

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judges:
Derek D. Butler (arraignment)
Eric A. Catto (motions and trial)

Sentence adjudged 30 October 2020 by a general court-martial convened at Marine Corps Recruit Depot Parris Island, South Carolina, consisting of a military judge sitting alone. Sentence in the Entry of Judgment: reduction to paygrade E-1, total forfeitures, confinement for 52 months, and a dishonorable discharge.

For Appellant:
*Lieutenant Commander Daniel O. Moore, JAGC, USN*

For Appellee:
*Major Clayton L. Wiggins, USMC*
*Captain Tyler W. Blair, USMC*

—————————————

**This opinion does not serve as binding precedent, but
may be cited as persuasive authority under
NMCCA Rule of Appellate Procedure 30.2.**

—————————————

PER CURIAM:

Appellant was convicted, pursuant to his pleas, of attempted indecent visual recording, wrongful possession and use of a controlled substance, indecent exposure, indecent visual recording, and possessing, viewing, and producing child pornography in violation of Articles 80, 112a, 120c, and 134, Uniform Code of Military Justice [UCMJ].[1] Appellant asserts two assignments of error: (1) the forensic search of Appellant's cellphone constituted an unlawful general search in violation of the Fourth Amendment; and (2) the military judge abused his discretion when he denied Appellant's motion for recusal for bias given his relationship to trial counsel and a victim in the case. We find no prejudicial error and affirm.

## I. BACKGROUND

On 23 December 2018, nine Marine recruits reported to their chain of command that the driver of a car had exposed his genitals to them while they were walking aboard Marine Corps Recruit Depot Parris Island [MCRD]. Two of the recruits identified the make and model of the car, and investigators were able to identify a matching vehicle registered to Appellant that was driven onto MCRD twice that day. Appellant was subsequently identified in a photo lineup. When interviewed by Criminal Investigation Division [CID] agents, he denied committing the alleged offense but admitted being in the vicinity around the same time. CID reviewed video camera footage recorded on base which established that Appellant had a cellphone in his possession around the time of the incident. Based on the investigation, Appellant's commanding officer authorized the seizure of Appellant's cellphone and authorized law enforcement to search it for "all location data stored on the phone or within any application within the phone for 23 Dec[ember] [20]18."[2]

—————————————

[1] 10 U.S.C. §§ 880, 912a, 920c, 934.

[2] App. Ex. XXVI at 55.

After being presented with the search authorization, Appellant provided the phone and its passcode to CID, which then sent the phone to the Defense Cyber Crime Center [DC3] to be searched pursuant to the authorization. DC3 extracted all data from Appellant's phone and provided the extraction file to a digital forensic examiner to conduct the search. The examiner reviewed the search authorization and used the "Cellebrite" physical analyzer program to organize the phone's data into a readable format. This method separates the data into categories, or "parsed data," such as "device locations," "SMS messages," "texts," "images," and "internet history."[3]

The examiner first searched the "device locations" category, which yielded no relevant location data for the date in question. He next began "making a plan to start looking at the data that was not parsed properly or at all by [the] physical analyzer and . . . start looking at apps . . . likely to contain location data."[4] As he knew based on his training and experience that photos commonly contain embedded global positioning system [GPS] data, he went to the "images" category in the physical analyzer. When he opened this category, the default review setting placed the over 200,000 images stored on Appellant's phone into "row after row after row of little thumbnail views of the individual pictures."[5] The examiner then reorganized the images into a "table view," which placed each thumbnail image in its own row next to columns of related data—such as filename, file size, and date created—that could be further sorted and filtered.[6]

The examiner then sorted the images by descending file size, so that he could "view the largest photos first, as they would likely be photos taken by the device," which could contain location data.[7] He testified that "once I got it into these columns and sorted largest to smallest I was going to begin filtering. My thought process[] is as I filter the larger ones will stay at the top and I don't have to re-sort every time I apply the filter."[8] His intent was to sort "for all photos that contain GPS [location data] and then . . . filter that with a date."[9]

---

[3] R. at 237–39; App. Ex. XXV at 87.

[4] *Id.* at 240.

[5] *Id.*

[6] App. Ex. XXVI at 97.

[7] App. Ex. XXVI at 97; R. at 243.

[8] R. at 243.

[9] *Id.*

However, "before [he] could set a filter to only show photos with metadata that contains location data," he saw a thumbnail image of suspected child pornography.[10] He then stopped the search, and law enforcement requested additional authorization to search Appellant's phone for child pornography. After the additional search authorization was obtained, the examiner resumed searching Appellant's phone and other electronic devices and uncovered evidence of additional misconduct, including child pornography and indecent recordings.

At trial, Appellant moved to suppress the evidence for violation of his Fourth Amendment rights during the search of his cellphone. Upon retracing the DC3 examiner's search methodology, Appellant's digital forensics expert testified that if the examiner had first filtered the 200,000+ images for only those containing location data, as opposed to sorting them by file size, the examiner would not have seen the thumbnail image of suspected contraband. The military judge denied Appellant's suppression motion, finding the examiner's search of the phone was "conducted in a reasonable manner and did not exceed the scope of the [search authorization]" and that the suspected contraband was discovered in plain view during the search for location data.[11]

Appellant subsequently entered into a plea agreement with the convening authority that conditioned his guilty pleas on his right to appeal the military judge's suppression ruling.

## II. DISCUSSION

### A. "Reasonableness" of the Cellphone Search

We review a military judge's ruling on a motion to suppress evidence for abuse of discretion and consider the evidence in the light most favorable to the party that prevailed on the motion.[12] A military judge abuses his discretion if the findings of fact upon which he predicates his ruling are not supported by the evidence in the record, if he uses incorrect legal principles, or if he applies

---

[10] App. Ex. XXVI at 97.

[11] App. Ex. LIII at 22.

[12] *United States v. Blackburn*, 80 M.J. 205, 210-11 (C.A.A.F. 2020).

the legal principles to the facts in a way that is clearly unreasonable.[13] To constitute as an abuse of discretion, the decision must be "arbitrary, fanciful, clearly unreasonable or clearly erroneous."[14]

The Fourth Amendment provides,

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.[15]

A search conducted pursuant to a warrant or search authorization is presumptively reasonable.[16] However, search authorizations must "describe the things to be seized with sufficient particularity to prevent a general exploratory rummaging in a person's belongings."[17] As the Supreme Court has explained, "[b]y limiting the authorization to search to the specific areas and things for which there is probable cause to search, the [particularity] requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit."[18]

Data stored within a cell phone falls within the Fourth Amendment's protections.[19] However, such devices present "distinct issues," and "[t]he prohibition of general searches is not to be confused with a demand for precise ex ante knowledge of the location and content of evidence."[20] Given "the dangers of too narrowly limiting where investigators can go," such searches may be properly

---

[13] *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010).

[14] *United States v. Sullivan*, 74 M.J. 448, 453 (C.A.A.F. 2015) (citation omitted).

[15] U.S. Const. amend. IV.

[16] *See United States v. Wicks*, 73 M.J. 93, 99 (C.A.A.F. 2014) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)).

[17] *United States v. Richards*, 76 M.J. 365, 369 (C.A.A.F. 2017) (quoting *United States v. Carey*, 172 F.3d 1268, 1272 (10th Cir. 1999)).

[18] *Maryland v. Garrison*, 480 U.S. 79, 84 (1987).

[19] *Riley v. California*, 573 U.S. 373, 386 (2014).

[20] *Richards*, 76 M.J. at 369-70 (citation omitted).

limited "to evidence of specific federal crimes or specific types of material" without necessarily "requir[ing] particular search methods and protocols."[21] An authorization to search cell phone data meets constitutional particularity requirements when the areas to be searched are "clearly related to the information constituting probable cause."[22]

Nevertheless, such searches remain subject to an "ex post reasonableness analysis" to assess whether they have struck the appropriate balance between being "expansive enough to allow investigators access to places where incriminating materials may be hidden, yet not so broad that they become the sort of free-for-all general searches the Fourth Amendment was designed to prevent."[23] One aspect of this analysis examines whether the person conducting the search does so "strictly within the bounds set by the warrant."[24] To that end, "[n]arrowly tailored search methods that begin looking 'in the most obvious places and [then] progressively move from the obvious to the obscure' should be used where possible, but are not necessary in every case."[25] The Fourth Amendment standard is "reasonableness"[26] and courts assess the government's search methods after the fact "in light of the specific circumstances of each case."[27]

Evidence falling outside the scope of a warrant or search authorization may be seized if "[t]he person while in the course of otherwise lawful activity observes in a reasonable fashion property or evidence that the person has probable cause to seize."[28] In order for this "plain view" exception to apply, (1) the officer must not violate the Fourth Amendment in arriving at the spot from which the incriminating materials can be plainly viewed; (2) the incriminating character of the materials must be immediately apparent; and (3) the officer

---

[21] *Id*. at 370 (citation omitted).

[22] *United States v. Allen*, 53 M.J. 402, 408 (C.A.A.F. 2000).

[23] *Richards*, 76 M.J. at 370 (citations omitted).

[24] *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 394 n.7 (1971).

[25] *United States v. Loera*, 923 F.3d 907, 920 (10th Cir. 2019) (quoting *United States v. Burgess*, 576 F.3d 1078, 1094 (10th Cir. 2009)).

[26] *United States v. Hill*, 459 F.3d 966, 974–77 (9th Cir. 2006) (upholding off-site search of all defendant's computer storage media for evidence of child pornography).

[27] *United States v. Christie,* 717 F.3d 1156, 1166 (10th Cir. 2013).

[28] Military Rules of Evidence [Mil. R. Evid.] 316(c)(5)(C).

must have lawful access to the object itself.[29] In this regard, the Supreme Court has noted that the "distinction between looking at a suspicious object in plain view and moving it even a few inches is much more than trivial for the purposes of the Fourth Amendment," and the plain view exception must "not be used to extend a general exploratory search from one object to another until something incriminating at last emerges."[30]

Even where evidence is obtained as a result of an unlawful search or seizure, it may only be excluded from use at trial if such exclusion results in appreciable deterrence of future unlawful searches or seizures and the benefits of such deterrence outweigh the costs to the justice system.[31] As the Supreme Court has explained,

> [t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system. As laid out in our cases, the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.[32]

Thus, "[t]he extent to which the exclusionary rule is justified by these deterrence principles varies with the culpability of the law enforcement conduct."[33] "Evidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment."[34]

Here, the military judge denied Appellant's suppression motion in a written ruling wherein he made detailed findings of fact, discussed the applicable law, and drew conclusions based upon his application of the law to the facts. He found that (1) the search authorization authorized the DC3 examiner to look in any applications on the phone where location data from the date 23 Decem-

---

[29] *Richards*, 76 M.J. at 371.

[30] *Arizona v. Hicks*, 480 U.S. 321, 325, 328 (1987) (citation and internal quotation marks omitted).

[31] Mil. R. Evid. 311(a).

[32] *Herring v. United States*, 555 U.S. 135, 144 (2009).

[33] *Id*. at 143.

[34] *Id*. (internal quotation and citation omitted).

ber 2018 could be located; (2) the examiner's approach to the search was intended to comply with the parameters of the search authorization and be efficient; (3) the examiner first searched the phone's parsed location data, which yielded no data for 23 December 2018; (4) based on his training and experience, the examiner then planned to search for location data within the phone's photos, which he understood to often contain location data; (5) to effect this search, he sorted the images by file size, since the "larger files were more likely to contain location data;" (6) after sorting by file size, he observed suspected child pornography in one of the first ten images, out of over 200,000; and (7) after seeing this image, he immediately stopped his search, contacted his supervisor, and received a new search authorization to search the files for child pornography.[35]

The military judge cited the Fourth Amendment particularity requirement's application to electronic devices, noting that "the courts have looked to what is reasonable under the circumstances" when determining whether a search was lawfully conducted within the scope of a search authorization.[36] Focusing specifically on the examiner's decision to search the images for location data, the military judge found that the examiner opened the images category because "photographs are a common place to store [location] data;" that he switched from the thumbnail view to the table view; and that he then sorted by file size, largest to smallest, because "he believed that user-taken photos might have location meta-data."[37] The military judge found that the examiner's "plan was to next sort the images by date," but that he stopped the search because after sorting the images by size he saw an image of suspected child pornography, which was "visible within [the examiner's] screen without even scrolling."[38]

On these facts, the military judge concluded the examiner's search was "conducted reasonably and did not exceed the scope of the [search authorization]."[39] He rejected Appellant's argument that the search should have been conducted according to the methodology proffered by Appellant's digital forensics expert because the examiner's search was conducted reasonably, which is all the Fourth Amendment requires. He further concluded that even if the

---

[35] App. Ex. LIII at 6-7.

[36] *Id*. at 12, 20.

[37] *Id*. at 20.

[38] *Id*.

[39] *Id*.

search methodology was unreasonable, excluding the evidence would not appreciably deter future unlawful searches, since the examiner "attempted to stay within the scope of the [search authorization], only searching in areas of the phone authorized by the [search authorization] . . . , looking for images that would have been stored in the photo application of the phone, since pictures often contain location metadata."[40]

While we find the DC3 examiner's search methodology concerning, we find no abuse of discretion in the military judge's ruling. The findings of fact upon which the military judge predicated his conclusions are supported by the evidence in the record and are not clearly erroneous; he applied the correct legal principles to the facts in a reasonable manner; and the conclusions he reached are not arbitrary, fanciful, clearly unreasonable or clearly erroneous.

Appellant takes issue with the examiner's decision to first sort the 200,000+ images by file size before setting filters to narrow them to only (a) those containing location data and (b) those created on 23 December 2018. We, too, find it difficult to follow the examiner's logic in sorting the data in this manner, which appears to have been driven by mere convenience. As he testified, his plan was that "once [he] got it into these columns and sorted largest to smallest [he] was going to begin filtering. [His] thought process[] [was that] as [he] filter[ed,] the larger ones [would] stay at the top and [he wouldn't] have to re-sort every time [he] appl[ied] the filter . . . for all photos that contain GPS [location data] and then . . . filter[ed] that with a date."[41] But since his intention was to "set a filter to only show photos with metadata that contains location data,"[42] that would seem to obviate the need to sort by file size at all, since *every* image file filtered in this way would contain location data, not just the larger ones.

The real logic driving the examiner's decision may well be the apparent skepticism at DC3 that the Cellebrite data analyzer can accurately parse data in this fashion, and the consequent expectation that examiners will routinely review data files manually to crosscheck the accuracy of the Cellebrite filters. As the examiner himself noted, after discussing the issue with one of DC3's top examiners, his job was "to analyze ALL DATA on the device, and not just throw the extraction into a tool and start filtering for dates that may or may not include all data. . . . We feel that filtering down to a date range up front will only

---

[40] *Id.*

[41] R. at 243.

[42] *Id.*

lead to missed evidence in any exam, and there is no such 'SOP [Standard Operating Procedure]' for examiners."[43] Similarly, another examiner at DC3 opined that "search authority that specifies 'all location data stored on the phone or within any application within the phone . . .' should involve manual review. Without manual verification, an examiner would not be able to accurately state that all location data, especially within apps, was reviewed for relevance."[44]

Such an unwritten policy of defaulting to manual review of data files, even where a search authorization contains specific search limitations, is problematic from a plain view standpoint. As our superior court has noted,

> Courts have struggled to apply the plain view doctrine to search of digital devices, given the vast amount of information they are capable of storing and the difficulty inherent in tailoring searches of electronic data to discover evidence of particular criminal conduct. In light of these difficulties, the application of the plain view doctrine in a digital context poses a serious risk that every warrant for electronic information will become, in effect, a general warrant, rendering the Fourth Amendment irrelevant."[45]

And, as we have discussed before, we are mindful of the dangers posed by allowing digital searches to devolve into the sort of "wide-ranging exploratory searches the Framers intended to prohibit."[46]

Nevertheless, in this case, we do not find that the military judge clearly erred when he found "no evidence to suggest that [the examiner] was rummaging through areas of [Appellant's phone] where the [search authorization] did not allow him to look."[47] Although the examiner's search methodology was less than ideal, it was directed toward finding location data for 23 December 2018, in compliance with the search authorization. There is nothing in the record that indicates he was deliberately searching for child pornography, and once

---

[43] App. Ex. XXVI at 91.

[44] App. Ex. XXVI at 100.

[45] *United States v. Gurczynski*, 76 M.J. 381, 387 (C.A.A.F. 2017) (citations and internal quotation marks omitted).

[46] *United States v. Lee*, No. 202000239, 2022 CCA LEXIS, *32 (N-M. Ct. Crim. App. Apr. 5, 2022) (unpublished) (quoting *Garrison*, 480 U.S. at 84).

[47] App. Ex. LIII at 20.

he saw the image at issue he immediately halted the search without further manipulating it and sought a new authorization.

We note, however, that another military judge might reasonably have concluded otherwise on similar facts. The plain view exception requires that each step of an authorized search comply with the Fourth Amendment in arriving at the spot from which the incriminating materials are plainly viewed. Digital forensic examiners must therefore take great care to not only fully document their search methods, but also narrowly tailor them to "begin looking 'in the most obvious places and [then] progressively move from the obvious to the obscure.'"[48] The examiner's search in this case was problematic in both respects. And in another case there may be additional evidence to support a finding of not just mere negligence in this regard, but the sort of "gross[] [or] . . . recurring or systemic negligence" that the exclusionary rule is specifically designed to deter.[49]

## B. Motion to Recuse

At trial the military judge disclosed that he had prior friendly, professional relationships with both the trial counsel and the trial defense counsel. Additionally, the trial defense counsel notified the military judge that one of the court reporters was a named victim in the case. After conducting voir dire about the military judge's relationships with the trial counsel and the court reporter, Appellant moved for the military judge's recusal. He argued that the military judge could not be impartial because of "implied bias," that the "public's confidence in military justice" would be undermined because of those relationships and that the military judge was required to recuse himself for apparent bias pursuant to Rules for Courts-Martial [R.C.M.] 902(a). After hearing argument, the military judge denied the motion.

Appellant then entered into a plea agreement in which he agreed to plead guilty to certain offenses conditioned upon his right to preserve certain issues for appeal—which did not include the denial of his recusal motion. He also agreed to plead guilty unconditionally to Charge III and its sole specification (indecent exposure in violation of Article 120c, UCMJ), and waived all motions except those that are non-waivable under R.C.M. 705(c)(1)(B) with respect to that offense. At trial, after agreeing to be tried and sentenced by the same military judge who had denied his recusal motion, Appellant confirmed that he

---

[48] *Loera*, 923 F.3d at 920 (quoting *Burgess*, 576 F.3d at 1094).

[49] *Herring*, 555 U.S. at 144.

understood these provisions and had freely and voluntarily agreed to them in exchange for what he believed to be a beneficial plea agreement.

### 1. Waiver

We review de novo the legal question of whether an appellant has waived an issue.[50] Forfeiture is the failure to make a timely assertion of a right whereas waiver is the intentional relinquishment or abandonment of a known right.[51] "Unlike claims based on actual bias, disqualification under R.C.M. 902(a) is subject to waiver after full disclosure on the record of the basis for disqualification."[52]

Here, the basis for Appellant's recusal motion under R.C.M. 902(a) was the relationship between the military judge and both the trial counsel and the court reporter, who was a named victim in Appellant's court-martial. We find that Appellant, having conducted voir dire of the military judge into these very issues, was fully informed and aware of the extent of the military judge's relationships with the individuals involved when he agreed to waive this issue to gain the benefit of his pretrial agreement. We find the knowing nature of this waiver further reinforced by Appellant's election to plead guilty before and be sentenced by the same military judge. Accordingly, we find that Appellant knowingly and intentionally waived the issue he now asserts as error.[53]

### 2. Apparent Bias

We generally do not review waived issues "because a valid waiver leaves no error for us to correct on appeal."[54] However, while there is no waiver provision present in Article 66, UCMJ, military courts of criminal appeals still must review the entire record and approve only that which "should be approved."[55]

---

[50] *United States v. Davis*, 79 M.J. 329, 331 (C.A.A.F. 2020).

[51] *Davis*, 79 M.J. at 331 (quoting *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009)).

[52] *United States v. Black*, 80 M.J. 570, 574 (C.A.A.F. 2020) (citing Rules for Courts-Martial [R.C.M.] 902(e); *United States v. Quintanilla*, 56 M.J. 37, 77 (C.A.A.F. 2001)).

[53] *See Gladue*, 67 M.J. at 314.

[54] *Davis*, 79 M.J. at 331 (quoting *United States v. Campos*, 67 M.J. 330, 332 (C.A.A.F. 2009)).

[55] *United States v. Chin*, 75 M.J. 220, 223 (C.A.A.F. 2016) (quoting Article 66, UCMJ).

This includes reviewing "whether to leave an accused's waiver intact, or to correct error."[56] In this case we leave the waiver intact because even if we were to review his claim, we would find no prejudicial error.

A military judge's decision not to recuse himself is reviewed for an abuse of discretion.[57] Any error is reviewed for harmlessness.[58] An accused has a constitutional right to an impartial judge.[59] However, there is a "high hurdle" an appellant must clear to prove that a military judge was partial or appeared to be so, as the law establishes a "strong presumption" to the contrary.[60] R.C.M 902(a) states that "a military judge shall disqualify himself . . . in any proceeding in which that military judge's impartiality might reasonably be questioned."[61] Our higher court has articulated this standard as "[a]ny conduct that would lead a reasonable man knowing all the circumstances to the conclusion that the judge's impartiality might reasonably be questioned."[62]

Having a professional relationship or friendship is not, in and of itself, disqualifying. As our superior court has noted "[t]he world of career [judge advocates] is relatively small and cohesive, with professional relationships the norm and friendships common."[63] In most instances, professional or friendly relationships do not require a military judge to recuse himself. The real question is not whether there is a relationship but, rather whether the relationship between a military judge and a party raises "special concerns," whether the relationship was "so close or unusual as to be problematic," and whether "the association exceeds what might reasonably be expected in light of the [normal] associational activities of an ordinary [military] judge."[64]

---

[56] *Id.*

[57] *United States v. Sullivan*, 74 M.J. 448, 453 (C.A.A.F. 2015).

[58] *United States v. Roach*, 69 M.J. 17, 20 (C.A.A.F. 2010) (citing *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 874 (1988)).

[59] *United States v. Butcher*, 56 M.J. 87, 90 (C.A.A.F. 2001) (quotation marks and citation omitted).

[60] *United States v. Quintanilla*, 56 M.J. 37, 44 (C.A.A.F. 2001).

[61] R.C.M. 902(a).

[62] *Hasan v. Gross*, 71 M.J. 416, 418 (C.A.A.F. 2012).

[63] *United States v. Uribe*, 80 M.J. 442, 447 (C.A.A.F. 2021) (citing *Butcher*, 56 M.J. at 91).

[64] *Uribe*, 80 M.J. at 447 (cleaned up).

Here, the military judge made findings, stated the law he was applying, and made his ruling on the record denying Appellant's motion. He cited R.C.M. 902 and applied the "objective standard of whether a reasonable person, knowing the circumstances, would conclude that the military judge's impartiality might reasonably be questioned."[65] He then discussed his application of *United States v. Uribe*, noting that while Appellant "has the Constitutional right to an impartial judge," a judge also "has as much of an obligation to not disqualify himself when there's no reason to do so."[66] He also considered the factors from *Liljeberg v. Health Servs. Acquisition Corp.*, for recusal: (1) "the risk of injustice to the parties in the particular case," (2) "the risk that the denial of relief will produce injustice in other cases," and (3) "the risk of undermining the public confidence in the judicial process."[67]

We find an objectively reasonable person aware of all the relevant facts concerning the military judge's professional relationship with the trial counsel and a named victim in Appellant's court-martial would have no questions about the military judge's impartiality. We therefore find no error in the military judge's decision to deny Appellant's motion that he recuse himself.

## III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, we have determined that the findings and sentence are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights occurred.[68]

The findings and sentence are **AFFIRMED**.



FOR THE COURT:

S. TAYLOR JOHNSTON
Interim Clerk of Court

---

[65] R. at 30.

[66] *Id.*

[67] *Id.* at 31 (quoting *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864 (1988)).

[68] Articles 59 & 66, UCMJ.