# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

––––––––––––––––––––

### No. ACM 39657

––––––––––––––––––––

### UNITED STATES
*Appellee*

**v.**

### Cory J. FRANTZ
Senior Airman (E-4), U.S. Air Force, *Appellant*

––––––––––––––––––––

Appeal from the United States Air Force Trial Judiciary

Decided 10 November 2020

––––––––––––––––––––

*Military Judge:* Mark W. Milam.

*Approved sentence:* Dishonorable discharge, confinement for 7 years, and reduction to E-1. Sentence adjudged 19 October 2018 by GCM convened at Aviano Air Base, Italy.

*For Appellant:* Major Mark J. Schwartz, USAF; Captain David L. Bosner, USAF; Tami L. Mitchell, Esquire.

*For Appellee:* Lieutenant Colonel Brian C. Mason, USAF; Major Jessica L. Delaney, USAF; Major Peter F. Kellett, USAF; Mary Ellen Payne, Esquire.

Before J. JOHNSON, POSCH, and KEY, *Appellate Military Judges.*

Chief Judge J. JOHNSON delivered the opinion of the court, in which Senior Judge POSCH and Judge KEY joined.

––––––––––––––––––––

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

––––––––––––––––––––

J. JOHNSON, Chief Judge:

A general court-martial composed of a military judge alone convicted Appellant, contrary to his pleas, of two specifications of committing lewd acts upon a child under the age of 12 years, in violation of Article 120b, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920b.[1,2] The military judge sentenced Appellant to a dishonorable discharge, confinement for seven years, and reduction to the grade of E-1. The convening authority approved the adjudged sentence, but deferred automatic forfeitures of pay and allowances until action pursuant to Articles 57(a) and 58b, UCMJ, 10 U.S.C. §§ 857(a), 858b, and waived the automatic forfeitures for the benefit of Appellant's dependent child until the earlier of six months or the expiration of Appellant's term of service pursuant to Article 58b, UCMJ.

Appellant raises nine issues on appeal: (1) whether the evidence is legally and factually sufficient to support his convictions; (2) whether the finding of guilty with regard to Specification 3 of the Charge is fatally ambiguous; (3) whether the Government violated Appellant's right to equal access to evidence; (4) whether the military judge abandoned his impartial judicial role and erroneously failed to disqualify himself; (5) whether Appellant's sentence is inappropriately severe; (6) whether the Government's failure to defer and waive automatic forfeitures in accordance with the convening authority's direction warrants relief; (7) whether the Naval Consolidated Brig Miramar (Miramar Brig) policy of preventing Appellant from having contact with his minor son is unconstitutional or violates Article 55, UCMJ, 10 U.S.C. § 855; (8) whether the military judge abused his discretion in declining to admit a defense exhibit; and (9) whether the delay in procuring prescription eyeglasses for Appellant during his confinement constituted cruel and unusual punishment.[3] In addition, although not raised by Appellant, we consider two further issues: whether the convening authority's failure to state his reasons for denying Appellant's request to defer his reduction in grade warrants relief; and whether Appellant is entitled to relief for facially unreasonable appellate delay. We affirm the findings, but we find that an error with respect to the convening authority's

---

[1] All references in this opinion to the Uniform Code of Military Justice (UCMJ), Rules for Courts-Martial, and Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2016 ed.).

[2] The military judge found Appellant guilty of Specification 3 of the Charge by exceptions and substitutions. The military judge found Appellant not guilty of two specifications of sexual assault of a child under the age of 12 years in violation of Article 120b, UCMJ.

[3] Appellant personally raises issues (8) and (9) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1992). We have carefully considered issues (8) and (9), and we find they warrant neither further discussion nor relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

denial of the requested deferment of the reduction in grade warrants relief with respect to the sentence.

## I. BACKGROUND

Appellant met AS, then a divorced mother of three children, in June 2013 when they both lived in the state of Washington. They began dating, and Appellant moved in with AS and her children for a period of time before he departed for Air Force basic training in November 2013. Appellant and AS married in February 2014 after Appellant learned he would be stationed at Aviano Air Base (AB) in Italy. Appellant and AS moved to Italy in July 2014, and AS's children joined them there approximately one month later.

The family eventually settled in a four-story house in a town near Aviano AB. On weekends AS would regularly go to the on-base fitness center, a drive of approximately 30 minutes each way, leaving Appellant with the children, who were nine, five, and three years old at the time. AS noticed that Appellant seemed to favor the oldest child, her daughter JZ, over the other children. For example, Appellant bought clothes for JZ, helped her clean her room, and tucked her into bed at night without doing the same for the other children.

JZ exhibited troubling behavior after she arrived in Italy. She showed no motivation in the on-base school, which assigned a counselor to meet with JZ regularly. At home, JZ resisted bathing, she was aggressive toward her younger brother, and she would spend time alone in a dark room.

In Italy, AS's marriage to Appellant deteriorated. According to AS, the couple frequently argued about the children, finances, and managing the household. Tensions increased in January 2015 when Appellant traveled to Nellis Air Force Base (AFB), Nevada, for several weeks of training. While Appellant was there, AS informed him she did not want to continue the marriage. Soon afterwards, AS found JZ in her bedroom holding a tablet and crying. JZ asked AS to "take back" what she said to Appellant so they would not "have to go." AS looked at the tablet and discovered JZ had been messaging with Appellant via Facebook. AS did not inspect the messages at that point, but replied to Appellant's messages to the effect that he should not contact JZ.

Within a few days, AS inspected the messages more closely. Some of the messages alarmed her. At one point in these messages, JZ wrote, "And I still will not tell anybody," to which Appellant responded, "Good," before JZ finished her sentence, "About us!" Shortly thereafter, Appellant sent JZ messages asking if she knew how to delete Facebook messages before sending her instructions on how to do so. Later, JZ made cryptic references to the "last night with [Appellant]" when he was "doin the laundry," which "still haunt[ed]" her. JZ

asked Appellant if he remembered "the laundry," to which Appellant responded that he did remember "[t]alking to [JZ] while doing laundry." JZ responded with a "thumbs up" symbol, to which Appellant responded with a winking emoji and "[t]hought so." Appellant and JZ shared that each missed the other and liked the other's smile. Coupled with JZ's troubling behavior, the messages led AS to believe that "there was something going on" and she "wanted it to be investigated." Although most of these electronic messages were later lost, AS printed a copy at the time.

AS took the messages to the Family Advocacy office at Aviano AB. Family Advocacy referred AS to the Air Force Office of Special Investigations (AFOSI). However, when the AFOSI interviewed JZ, she denied that Appellant had abused her, and the investigation ended.

AS and the children moved out of the house to stay with friends before Appellant returned from Nellis AFB, and the children never lived with Appellant again. According to AS, Appellant was uncooperative with AS's efforts to return to the United States, and he refused to provide adequate financial support until she sought assistance from his chain of command. As a result, AS sold most of the family's belongings in order to raise money, which caused further acrimony. AS and her children were eventually able to leave Italy and return to Washington; the divorce became final in March 2016.

In the months that followed their departure from Italy, JZ moved multiple times within Washington between her mother AS, her biological father, and her grandparents. By the beginning of 2017, JZ was 11 years old and again living with AS, who had remarried. Although AS had taken away JZ's tablet, JZ's school had provided her a laptop computer with Internet capability. In early 2017, AS learned that JZ had been communicating again via Facebook with Appellant, who was still stationed at Aviano AB. When confronted, JZ initially denied communicating with Appellant, but soon JZ admitted that she had been doing so, and she permitted AS to read the messages. As AS and her husband reviewed the messages, JZ initially lay quietly on a couch before she covered her head with a blanket and began to cry.

The messages between Appellant and JZ ranged from mundane descriptions of daily activities, to false claims by JZ on such subjects as owning horses and being pregnant, to expressions of mutual affection and attraction. Appellant repeatedly commented that he felt a special bond with JZ, that he thought she was beautiful, and that he wanted to hold and kiss her. One notable early exchange included the following:

> [JZ:] remember when mom used to go to the gym on weekends and we would hang out
>
> [Appellant:] Yes

[JZ:] do you remember what we did when we hung out

[Appellant:] Yes

Do you

She didn't like me and you spending time together

[JZ:] Yea I do

Did she know?!

[Appellant:] Idk what you told her or what she thinks she knows

I didn't say anything about hanging out

We watched movies

[JZ:] I said the same thing

In later messages, Appellant implied and then expressed his purported sexual attraction to JZ more openly. Appellant told JZ he thought about sex often, had thought about having sex with JZ, and would be willing to have sex with her when she was older, because "that's the legal answer." When JZ told Appellant she would kiss and marry Appellant if she was his age, he responded that JZ was "gorgeous, smart and fun," and he would kiss and marry her too if they were the same age. Later, Appellant told JZ he could "teach [her] a thing or two" about sex "when she was ready to learn." When JZ asked Appellant if he would send her a picture of his "you know what" if she asked him to, Appellant responded that he "would if [JZ] sent one back." JZ replied that she "would send one" when she was "alone," to which Appellant responded "Damn," "Same." When JZ asked Appellant "on a scale of 1-10 how bad do you want to have sex with me," Appellant told her the answer was ten; JZ responded "same." Then the following exchange ensued:

[JZ:] I am being for real with this one…It honestly SUCKS that we cant have sex till im 18

[Appellant:] Yeah

Well I think it's 17 with consent

If you really wanted to

[JZ:] yeah

[Appellant:] But 18 is just safer

[JZ:] yep for sure

[Appellant:] Does suck

[JZ:] yea

> if you REALLY wanted to… would you have sex while it is still illegal just questioning
>
> [Appellant:] Maybe
>
> But it's better when you are of age
>
> [JZ:] yup
>
> [Appellant:] Just because it can still come back on me
>
> [JZ:] yea it can
>
> [Appellant:] That's why I said maybe because it's not yes but it's not saying no
>
> [JZ:] true true
>
> [Appellant:] Wish you were of age now

Later, Appellant and JZ joked about JZ taking her pants and underwear off when she came to visit him sometime. When Appellant dared her to do so, JZ asked "Why? What will you do if I do?" Appellant responded, "Idk," "That's hot though." At another point, Appellant suggested JZ might secretly meet Appellant when he came to Washington to visit his father.

Perceiving that some of the messages were sexual in nature, AS asked JZ if Appellant had done anything to her physically while they were in Italy. JZ replied that Appellant had. The following morning AS took JZ to the civilian police in Washington, who began an investigation and contacted the AFOSI.

At trial, JZ testified *inter alia* that Appellant touched her inappropriately when they lived together in Italy.[4] According to JZ, on multiple occasions when AS was at the gym, Appellant brought JZ to the laundry room while her brother and sister were upstairs watching movies. In the laundry room, Appellant put her on top of the dryer or washing machine and put his hands underneath her shirt. She further testified that "sometimes" he would also pick her up and hold her by her "butt" against the front of his body, and sometimes he "wrapped his hands around [her] waist." JZ further testified that on multiple occasions when AS was away from the house Appellant took JZ to JZ's bedroom, which like the laundry room was on the bottom floor. According to JZ, in the bedroom Appellant inserted his fingers and his tongue in her vagina as she lay on the bed.

The military judge found Appellant guilty of one specification of committing lewd acts on JZ by communicating indecent language to her on divers occasions with the intent to gratify his sexual desire, and one specification of committing

---

[4] JZ was 13 years old at the time of Appellant's trial.

a lewd act on JZ by "putting his arms around [JZ], and intentionally touching and holding onto her buttocks with his hands, with an intent to gratify his sexual desire." The military judge found Appellant not guilty of one specification of sexual assault against JZ by penetrating her vulva with his fingers and one specification of sexual assault by penetrating her vulva with his tongue, both with the intent to gratify his sexual desire.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

#### 1. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

Article 120b(c), UCMJ, provides: "Any person subject to this chapter who commits a lewd act upon a child is guilty of sexual abuse of a child and shall be punished as a court-martial may direct." *Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 45b.a.(c). A "child" is "any person who has not attained the age of 16 years." *MCM*, pt. IV, ¶ 45b.a.(h)(4). The term "lewd act" includes, *inter alia*, "any sexual contact with a child" and "intentionally

communicating indecent language to a child by any means, including via any communication technology, with an intent to . . . arouse or gratify the sexual desire of any person." *MCM*, pt. IV, ¶ 45b.a.(h)(5). "'Indecent' language is that which is grossly offensive to modesty, decency, or propriety, or shocks the moral sense, because of its vulgar, filthy, or disgusting nature, or its tendency to incite lustful thought. Language is indecent if it tends reasonably to corrupt morals or incite libidinous thoughts." *MCM*, pt. IV, ¶ 89.c. "Sexual contact" includes "any touching . . . either directly or through the clothing, [of] any body part of any person, if done with an intent to arouse or gratify the sexual desire of any person." *MCM*, pt. IV, ¶ 45.a.(g)(2); *see MCM*, pt. IV, ¶ 45b.a.(h)(1).

### 2. Analysis

Appellant asserts the evidence was legally and factually insufficient to support his conviction for either specification for which the military judge found him guilty. We consider each specification in turn.

#### a. Intentionally Communicating Indecent Language

On appeal, Appellant does not contest that he in fact sent the messages in question to JZ, that he did so intentionally, or that he knew JZ's age. With respect to the content of the messages, the indecency of a communication depends on "the context in which it is made." *United States v. Green*, 68 M.J. 266, 270 (C.A.A.F. 2010) (citation omitted). In this case, Appellant communicated to an 11-year-old child that he thought about sex a lot, that he desired to have sexual intercourse with her in the future, that his sexual desire for her was a ten out of ten, that it "sucked" that they could not have sex before she was 17 or 18 years old, and that he would "maybe" have sex with her earlier even if it was illegal. In addition, he discussed—albeit hypothetically—sending a photo of his genitals to JZ in return for a photo of hers. The context for these communications included, as the military judge found, that Appellant had previously touched JZ's buttocks and torso with the intent to gratify his sexual desire, when she was only nine years old and he was her stepfather. We find Appellant sent JZ messages that were "grossly offensive to modesty, decency, or propriety," and therefore indecent. *MCM*, pt. IV, ¶ 89.c.

Without conceding indecency, Appellant contends for purposes of argument that even if we find some of his later messages were indecent, there is insufficient evidence of his intent to gratify his sexual desire, because he told JZ they should wait until she was 18 years old to have sex. We disagree and find ample evidence that Appellant intended to gratify his sexual desire at the time he sent the messages. Again, the context for these messages included that Appellant had touched JZ's body for the purpose of gratifying his sexual desire when they lived in Italy. The nature of the messages and Appellant's comments suggest he found his communications with JZ sexually stimulating. If there were

8

any doubt, his comment that he found contemplating JZ removing her pants and underwear when she visited him to be "hot" would lay it to rest.

### b. Sexual Contact

With respect to the specification that Appellant committed sexual contact on JZ by putting his arms around her and putting his hands on her buttocks with the intent to gratify his sexual desire, Appellant contends JZ's testimony is simply not credible enough to sustain his conviction. In fact, there are significant problems with JZ's credibility. She was reluctant to testify about certain events, notably the sexual acts Appellant allegedly performed on her in her bedroom in Italy. Her testimony was sometimes confusing and incomplete, requiring the counsel and military judge to readdress the same events with her multiple times. More significantly, by her own admission JZ lied about many things from 2015 to 2017. She often lied in her 2017 messages to Appellant about owning horses and having a boyfriend, and she lied to Appellant and others about being pregnant; according to JZ, she did so to get "attention." More problematically, JZ admitted that she had lied to investigators about Appellant's offenses. She lied to the AFOSI in 2015 when she denied Appellant had touched her inappropriately, because she was "young, dumb, and [she] thought [she] would get in trouble." JZ admitted she lied to the civilian police in 2017 when she told them she kicked Appellant when he was touching her, and when she claimed at one point Appellant had threatened to kill her mother AS. JZ testified she did not know why she told these lies. JZ told the military judge she understood it was important to tell the truth in her courtroom testimony, and she indicated she had put her "lying ways" behind her; however, when the military judge asked JZ why he should believe what she said about Appellant when she had "said so many lies in the past," she responded "I don't have an answer to that."

The military judge evidently recognized JZ's credibility problems. He questioned her directly about the importance of telling the truth and confronted her about her admitted past false statements. Notably, after both parties rested the military judge recalled JZ to give further testimony. Among other questions, the military judge focused JZ on "the first time" Appellant touched JZ, which she confirmed was in the laundry room. JZ described again how Appellant picked her up and put her on the washing machine or dryer. Then Appellant put his hands "in [her] shirt" and "around [her] waist." At another point, he "picked [her] up and held [her] by the butt." She explained:

> So you know how like you hold like a little kid off to the side or like you're holding someone and you kind of like hold them kind of like by the thigh I guess. He had his hands like around my butt.

9

. . . .

> I think he was lifting me off of whatever I was sitting on. And he had picked me up and he was holding me by the butt. And then instead of like having me off to the side kind of on his hip, he kind of had me in front of him.

The military judge found Appellant not guilty of the alleged sexual acts in JZ's bedroom. However, he found Appellant guilty of one instance of alleged sexual contact in the laundry room, in accordance with JZ's recall testimony. Significantly, unlike the alleged bedroom incidents, JZ's contemporary messages to Appellant in 2015 corroborated that something significant occurred between her and Appellant in the laundry room. In addition, her testimony regarding this incident was more certain, specific, and definite than her description of the bedroom incidents. We are also cognizant that the military judge observed JZ's testimony and evidently carefully considered her credibility. Coupled with Appellant's response of "good" when JZ promised not to "tell anybody" about them in 2015, Appellant immediately sending instructions on how to delete Facebook messages, and other evidence of Appellant's sexual interest in JZ, we conclude the evidence supports the military judge's findings.

### c. Conclusion as to Legal and Factual Sufficiency

Drawing every reasonable inference from the evidence of record in favor of the Government, we conclude the evidence was legally sufficient to support Appellant's convictions for sexual abuse of a child by communicating indecent language and by sexual contact. *See Robinson*, 77 M.J. at 297–98. Additionally, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. *See Turner*, 25 M.J. at 325.

### B. Ambiguous Finding

#### 1. Additional Background

Specification 3 of the Charge alleged that Appellant:

> [D]id, at or near Fanna, Italy, *on divers occasions*, between on or about 7 August 2014 and on or about 21 January 2015, commit lewd acts upon [JZ], a child who had not attained the age of 12 years, to wit: intentionally touching her buttocks with his hands, with an intent to gratify his sexual desire.

(Emphasis added).

JZ's initial testimony indicated Appellant touched her on her buttocks and elsewhere multiple times in the laundry room. As described above, after both parties had rested, the military judge exercised his authority under Article 46,

UCMJ, 10 U.S.C. § 846, to recall JZ for additional testimony. During that recall testimony, the military judge had JZ focus on "the first time" Appellant touched JZ, which JZ confirmed was in the laundry room. JZ again described how Appellant put his arms around her and held her by her buttocks on that occasion.

The military judge found Appellant guilty of Specification 3 by exceptions and substitutions. According to the modified specification, the military judge found that Appellant:

> [D]id, at or near Fanna, Italy, in the laundry room of the family home, on the day of the first alleged touching incident, between on or about 7 August 2014 and on or about 21 January 2015, commit a lewd act upon [JZ], a child who had not attained the age of 12 years, to wit: putting his arms around [JZ], and intentionally touching and holding onto her buttocks with his hands, with an intent to gratify his sexual desire.

**2. Law**

"Whether a verdict is ambiguous and thus precludes a [Court of Criminal Appeals] from performing a factual sufficiency review is a question of law reviewed de novo." *United States v. Ross*, 68 M.J. 415, 417 (C.A.A.F. 2010) (emphasis and citation omitted).

"One or more words or figures may be excepted from a specification, and, when necessary, others substituted, if the remaining language of the specification, with or without substitutions, states an offense by the accused which is punishable by court-martial." *United States v. Trew*, 68 M.J. 364, 367 (C.A.A.F. 2010) (quoting Rule for Courts-Martial (R.C.M.) 918(a)(1), Discussion).

"[W]hen the phrase 'on divers occasions' is removed from a specification, the effect is that 'the accused has been found guilty of misconduct on a single occasion and not guilty on the remaining occasions.'" *United States v. Wilson*, 67 M.J. 423, 428 (C.A.A.F. 2009) (quoting *United States v. Augspurger*, 61 M.J. 189, 190 (C.A.A.F. 2005)). "If there is no indication on the record which of the alleged incidents forms the basis of the conviction, then the findings of guilt are ambiguous and the Court of Criminal Appeals cannot perform a factual sufficiency review." *Id.* (citing *United States v. Walters*, 58 M.J. 391, 396–97 (C.A.A.F. 2003)). "[T]he remedy for a *Walters* violation is to set aside the finding of guilty to the affected specification and dismiss it with prejudice." *United States v. Scheurer*, 62 M.J. 100, 112 (C.A.A.F. 2005) (footnote omitted).

**3. Analysis**

Appellant was charged with intentionally touching JZ's buttocks on divers occasions. The military judge excepted the "on divers occasions" language and

found Appellant guilty of touching JZ on only a single occasion, "on the day of the first alleged touching incident" which occurred "in the laundry room." By specifying in the substituted language the single occasion for which he was finding Appellant guilty, the military judge ensured the record indicated which alleged incident formed the basis of the conviction, and thereby avoided a fatally ambiguous finding.

Appellant contends the finding is nevertheless fatally ambiguous because the military judge did not identify the date on which he found the unlawful touching occurred. However, we find nothing in *Walters* or its progeny that requires that a date be used to "reflect the specific instance of conduct upon which [the] modified findings are based." *Walters*, 58 M.J. at 396. In many cases, a witness may provide testimony of sufficient strength to prove guilt beyond reasonable doubt, yet be unable to recall the date of the event with any specificity. In this case, JZ testified specifically to Appellant's actions on the first occasion that he touched her in the laundry room, and the military judge made clear that single identifiable incident was the basis for his non-divers findings. That is an adequate indication for this court to perform its factual sufficiency review, and it is what *Walters* requires.

## C. Equal Access to Evidence

### 1. Additional Background

At trial, AS testified that when she discovered the first exchange of Facebook messages between Appellant and JZ in 2015, she made screenshots of messages on JZ's Facebook account. AS then emailed these screenshots to herself, printed them out, and provided these printouts to the Family Advocacy office and to the AFOSI at Aviano AB. After AS discovered Appellant's second Facebook exchange with JZ in 2017, she found that the 2015 conversation had been deleted. However, she still had her email to herself from 2015.

At the conclusion of AS's direct examination, trial defense counsel informed the military judge that this was the first time they had learned about her email to herself, which the Defense had not received in discovery, although they had received the screenshots of the messages. Trial defense counsel stated the Defense would not be prepared to cross-examine AS "until we get that discovery from the government." Senior trial counsel explained the email had not been turned over because it was not in the possession of the Government; AS had accessed the email herself. The military judge recessed the court-martial for 43 minutes in order for AS to provide the email to the parties. Trial defense counsel then proceeded with cross-examination without further delay.

Subsequently, Special Agent (SA) IP of the AFOSI testified regarding various steps he took to investigate the case. On cross-examination, senior trial defense counsel asked SA IP whether he had attempted to download JZ's entire

12

Facebook profile. SA IP testified that he had, through a process offered by Facebook itself which he described as a "dump" of "every single piece of information or activity that [JZ] ever did on Facebook."[5] However, SA IP testified he did not review the entire "dump." He began to review the chat portion, but found "it was hard to tell who [was] sending and who was receiving the messages, because instead of having a name, you had a number." As a result, SA IP decided to rely on screenshots or "snippets" that the agents created from the messages displayed onscreen, because those "would be a good representation of what the communication was." However, these screenshots would not have included any deleted messages. SA IP did not know if the "dump" would have included deleted messages.

In response to questions from the military judge, SA IP testified that as of Appellant's trial, AFOSI no longer had the Facebook "dump." He explained that he "never saved it out of the computer that we have, and that computer was giving us a lot of issues and basically broke down a couple of times, and the information was lost." SA IP further testified that the AFOSI could obtain another "dump" from Facebook, but indicated he had not done so because the report of investigation had been closed and delivered to the legal office, which had not made such a request.

At no point during the trial did trial defense counsel object that they had been unaware of the Facebook "dump," request that the Government obtain another "dump," or allege any discovery or production violation or seek any other remedy with respect to the "dump."

### 2. Law

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The United States Supreme Court has extended *Brady*, clarifying "that the duty to disclose such evidence is applicable even though there has been no request by the accused . . . and that the duty encompasses impeachment evidence as well as exculpatory evidence." *Strickler v. Greene*, 527 U.S. 263, 280 (1999); *see United States v. Claxton*, 76 M.J. 356, 359 (C.A.A.F. 2017).

"A military accused also has the right to obtain favorable evidence under [Article 46, UCMJ] . . . as implemented by R.C.M. 701–703." *United States v. Coleman*, 72 M.J. 184, 186–87 (C.A.A.F. 2013) (footnotes omitted). Article 46,

---

[5] On redirect examination, SA IP explained that AS had provided oral and written consent for the Facebook "dump," although he understood the scope was limited to Facebook messages between Appellant and JZ.

UCMJ, and these implementing rules provide a military accused statutory discovery rights greater than those afforded by the United States Constitution. *See id.* at 187 (additional citation omitted) (citing *United States v. Roberts*, 59 M.J. 323, 327 (C.A.A.F. 2004)). With respect to discovery, R.C.M. 701(a)(2)(A) requires the Government, upon defense request, to permit the inspection of, *inter alia*, any documents "within the possession, custody, or control of military authorities, and which are material to the preparation of the defense . . . ." With respect to production, each party is entitled to the production of evidence which is relevant and necessary. R.C.M. 703(f)(1); *United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F. 2004) (citation omitted). Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "is of consequence in determining the action." Mil. R. Evid. 401. "Relevant evidence is 'necessary when it is not cumulative and when it would contribute to a party's presentation of the case in some positive way on a matter in issue.'" *Rodriguez*, 60 M.J. at 246 (quoting R.C.M. 703(f)(1), Discussion).

Each party to a court-martial must have an equal opportunity to inspect evidence and to obtain witnesses and other evidence. *United States v. Stellato*, 74 M.J. 473, 483 (C.A.A.F. 2015) (citing R.C.M. 701(e); Article 46, UCMJ). The United States Court of Appeals for the Armed Forces (CAAF) "has interpreted this requirement to mean that the 'Government has a duty to use good faith and due diligence to preserve and protect evidence and make it available to an accused.'" *Id.* (quoting *United States v. Kern*, 22 M.J. 49, 51 (C.M.A. 1986)). "The duty to preserve includes: (1) evidence that has an apparent exculpatory value and that has no comparable substitute; (2) evidence that is of such central importance to the defense that it is essential to a fair trial; and (3) statements of witnesses testifying at trial." *Id.* (citations omitted).

A party's failure to move to compel discovery or for production of witnesses or evidence before pleas are entered constitutes waiver. R.C.M. 905(b)(4); R.C.M. 905(e); *see United States v. Hardy*, 77 M.J. 438, 440–42 (C.A.A.F. 2018) (citations omitted) (concluding that where R.C.M. 905(e) refers to "waiver" it means "waiver" rather than forfeiture).

### 3. Analysis

Appellant's assignment of error raises three potential issues with respect to discovery and preservation of evidence related to JZ's Facebook account: (1) the Defense's access to the account; (2) the Government's failure to preserve data in the account; and (3) the Government's failure to preserve the information "dump" SA IP obtained from Facebook. We consider each issue in turn.

On appeal, Appellant contends the Government violated his right to equal access to JZ's Facebook account. We generally agree with Appellant that the

AFOSI's continued access to JZ's Facebook account during the investigation and trial brought it within the Government's control for purposes of discovery under R.C.M. 701(a). *See Stellato*, 74 M.J. at 484–85 (footnotes omitted). However, we find no support for Appellant's claim that "the [D]efense was never provided access to JZ's Facebook account, or with any opportunity to inspect her Facebook account and to independently verify the authenticity of the messages between JZ and Appellant." What is clear is that, with the possible exception of trial defense counsel's objection to not receiving AS's email to herself from 2015, the Defense never moved to compel discovery or production of this evidence, either before entry of pleas or after. Accordingly, under R.C.M. 905(b)(4), R.C.M. 905(e), and *Hardy*, Appellant waived the purported denial of access he seeks to raise on appeal.

Appellant also suggests the Government failed in its duty to preserve evidence from JZ's Facebook account. He contends it is possible that either AS or JZ could have accessed the account and deleted certain messages, distorting the context and meaning of the apparent exchanges between Appellant and JZ. He notes the AFOSI failed to subpoena Facebook records, obtain a forensic analysis of the account, or seize Appellant's own electronic devices and any evidence therein. However, there is no indication Appellant requested such a subpoena or production of such a forensic analysis, and Appellant presumably had access to his own Facebook account and electronic devices. Trial defense counsel certainly could, and did, comment in closing argument on alleged deficiencies in the investigation. However, the Defense waived any purported discovery or production violations by failing to move for relief at trial.

We acknowledge the AFOSI's failure to preserve the "dump" of JZ's Facebook account had the potential to violate the Government's obligation to exercise "good faith and due diligence to preserve and protect evidence and make it available to an accused." *Stellato*, 74 M.J. at 483 (quoting *Kern*, 22 M.J. at 51). The fact that SA IP found the report hard to read does not negate its potential significance for the trial. However, once again, the Defense failed to move to compel or seek relief as a result of the loss of the "dump," waiving the issue. On appeal, Appellant argues "the record suggests that the 'dump' did not become known to defense counsel until [SA] IP's testimony." However, the Defense made no such claim at trial, and we find the record suggests the Defense was not at all surprised by this testimony. Senior trial defense counsel specifically asked SA IP whether he had attempted to download JZ's entire Facebook profile, which led directly to SA IP's testimony regarding the "dump"—strongly suggesting this had been covered in pretrial interviews. In notable contrast to AS's testimony about her email in 2015, the Defense made no objection, complaint, or expression of surprise. At no point did the Defense move for a sanction against the Government, or request a replacement "dump" after SA IP

testified in response to the military judge's questioning that such a request was possible.

In general, a valid waiver leaves no error to correct on appeal. *United States v. Davis*, 79 M.J. 329, 331 (C.A.A.F. 2020) (quoting *United States v. Campos*, 67 M.J. 330, 332 (C.A.A.F. 2009)). We recognize our authority pursuant to Article 66, UCMJ, 10 U.S.C. § 866, to pierce waiver in order to correct a legal error in the proceedings. *See Hardy*, 77 M.J. at 443. Assuming *arguendo* the AFOSI's failure to preserve the "dump" was an error, we decline to pierce Appellant's waiver in this case. There is no indication the Defense was surprised by SA IP's testimony. Trial defense counsel made no objection and sought no relief. Instead, in closing argument trial defense counsel referred to the AFOSI's failure to review the "dump" in order to impugn the quality of the investigation. Accordingly, we find this assignment of error warrants no relief.

### D. Impartiality of the Military Judge

#### 1. Law

We review a military judge's decision not to recuse himself for an abuse of discretion. *See United States v. Sullivan*, 74 M.J. 448, 454 (C.A.A.F. 2015). "A military judge abuses his discretion when: (1) the findings of fact upon which he predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if his application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citing *United States v. Mackie*, 66 M.J. 198, 199 (C.A.A.F. 2008)). However, "[w]hen an appellant . . . does not raise the issue of disqualification until appeal, we examine the claim under the plain error standard of review." *United States v. Martinez*, 70 M.J. 154, 157 (C.A.A.F. 2011) (citing *United States v. Jones*, 55 M.J. 317, 320 (C.A.A.F. 2001)). "Plain error occurs when (1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice." *Id.* (citing *United States v. Maynard*, 66 M.J. 242, 244 (C.A.A.F. 2008)).

"An accused has a constitutional right to an impartial judge." *United States v. Wright*, 52 M.J. 136, 140 (C.A.A.F. 1999) (citations omitted). R.C.M. 902 governs disqualification of the military judge. R.C.M. 902(b) sets forth five specific circumstances in which a "military judge shall disqualify himself or herself." In addition, R.C.M. 902(a) requires disqualification "in any proceeding in which th[e] military judge's impartiality might reasonably be questioned." Disqualification pursuant to R.C.M. 902(a) is determined by applying an objective standard of "whether a reasonable person knowing all the circumstances would conclude that the military judge's impartiality might reasonably be questioned." *Sullivan*, 74 M.J. at 453 (citing *United States v. Hasan*, 71 M.J. 416, 418 (C.A.A.F. 2012)).

"There is a strong presumption that a judge is impartial, and a party seeking to demonstrate bias must overcome a high hurdle . . . ." *United States v. Quintanilla*, 56 M.J. 37, 44 (C.A.A.F. 2001) (citation omitted). A military judge "should not leave [a] case 'unnecessarily.'" *Sullivan*, 74 M.J. at 454 (quoting R.C.M. 902(d)(1), Discussion). "Although a judge has a duty not to sit when disqualified, the judge has an equal duty to sit on a case when not disqualified." *United States v. Witt*, 75 M.J. 380, 383 (C.A.A.F. 2016) (citing *Laird v. Tatum*, 409 U.S. 824, 837 (1972)).

"[A] military judge must not become an advocate for a party but must vigilantly remain impartial during the trial." *United States v. Ramos*, 42 M.J. 392, 396 (C.A.A.F. 1995). However, "a military judge is not 'a mere referee' but, rather, properly may participate actively in the proceedings." *Id.* (quoting *United States v. Graves*, 1 M.J. 50, 53 (C.M.A. 1975)). "Thus, while a military judge must maintain his fulcrum position of impartiality, the judge can and sometimes must ask questions in order to clear up uncertainties in the evidence or to develop the facts further." *Id.* (citations omitted); *see also* Mil. R. Evid. 614 (permitting the military judge to call and examine witnesses).

### 2. Analysis

On appeal, Appellant contends that "[t]hroughout the trial, the military judge assisted the Government in proving its case," which created a disqualifying appearance of bias under R.C.M. 902(a). Appellant cites several instances, including *inter alia* occasions on which the military judge: explained why he was sustaining a defense objection to a question calling for speculation and suggested a different line of questioning; interrupted trial defense counsel's cross-examination of JZ to ask his own clarifying questions; encouraged trial defense counsel to move on from an unsuccessful effort to impeach AS's testimony on cross-examination; questioned JZ about her memory of sending Facebook messages in 2015 in response to a defense objection to the admission of those messages; and interrupted trial counsel's direct examination of JZ to ask his own questions. In addition, Appellant cites two other incidents that warrant more detailed explanation.

First, during the direct examination of JZ, senior trial counsel offered Prosecution Exhibit 5, which was a copy of Facebook messages between Appellant and JZ from 2017. Senior trial defense counsel objected on the basis of authenticity and foundation. In response, senior trial counsel argued JZ had laid an adequate foundation because she "indicated familiarity with the conversation that's captured in the exhibit." In response to questioning by the military judge, senior trial counsel acknowledged the exhibit had been created at the AFOSI detachment. The military judge suggested that JZ's testimony was inadequate to authenticate all 261 pages of the exhibit. When senior trial counsel

proposed to "ask [JZ] some additional questions to clarify how a conversation went on for a month," the military judge responded:

> I will just tell you, it would be a lot more helpful for me, maybe this is a hint, if you can bring in an [AFOSI] agent, who took these pictures and told me this is from her Facebook account or [Appellant's] Facebook account and this is what we downloaded with regard to their conversation, then I have [JZ] saying yes, we did converse during that month . . . . That's the stuff that's going to help me, but I need to know this is truly the conversation that she had with [Appellant]. She has a memory and I am sure you are going to get to that, what she remembers. I think you're going to need that, but if you want to admit this document, then I need to know where it came from, from somebody, besides [JZ], because she can't remember this entire document. That's what I'm dealing with so, just so I lay it all out on the table, that is my problem.

The military judge then conditionally admitted Prosecution Exhibit 5, pending testimony from a witness who could testify to where the exhibit "came from." The exhibit was ultimately admitted without further objection, following the testimony of the agent and the paralegal who created the images.

The second incident that warrants explanation occurred after the Government recalled AS for additional testimony. Trial defense counsel cross-examined AS about whether she remembered reading certain messages from JZ to Appellant. Senior trial counsel objected to a question on the basis of "improper impeachment." When the military judge asked about the basis, senior trial counsel explained that trial defense counsel's question implied the messages were written in a particular order, although that order had not been established by AS's testimony. In response, the military judge stated:

> Okay. That is not lost on the court, and you get to come up and ask redirect. This is cross-examination. If defense counsel wants to portray or use their questions to try to trick a witness, that is not lost on the court and it's obviously not lost on you. So, when you get back up, you can clarify. I personally don't think it makes defense counsel look good when they are trying to do that, because I'm trying to understand what's going on. So, shoving words into people's mouths doesn't necessarily help me, but it is cross-examination and that is what he is permitted to do.

Senior trial counsel responded, "Understood, Your Honor." The military judge then added, "And sometimes, [the cross-examination] is very successful in

what it gets out. So, enough of the speech. I am overruling the objection." Trial defense counsel then continued with cross-examination.

Appellant did not raise the issue of the military judge's disqualification at trial. Accordingly, we review the military judge's decision not to disqualify himself *sua sponte* for plain error. *See Martinez*, 70 M.J. at 157 (citation omitted). Several factors contribute to our conclusion that the military judge did not commit a plain or obvious error.

First, "[f]ailure to object at trial to alleged partisan action on the part of a military judge may present an inference that the defense believed that the military judge remained impartial." *United States v. Foster*, 64 M.J. 331, 333 (C.A.A.F. 2007) (citation omitted). We find trial defense counsel's failure to raise the issue at trial to be some indication that the Defense did not believe the military judge was, or appeared to be, biased in favor of the Government.

Second, the military judge also directed explanatory comments on evidence to the Defense. In particular, at one point the military judge assisted senior defense counsel in responding to trial counsel's objection to an exhibit the Defense sought to introduce. Thus, the military judge exhibited a tendency to facilitate the introduction of relevant evidence, regardless of which party was the proponent.

Third, it is highly significant that Appellant elected to be tried by the military judge alone. There were no court members present to observe and potentially be influenced by the manner in which the military judge interacted with the parties. Moreover, as the trier of fact, the military judge had an equal right to the parties to seek evidence, call witnesses, and ask questions. *See* 10 U.S.C. § 846(a). To the extent the military judge, at times, steered counsel toward witnesses and lines of questioning that the military judge believed would be useful, the fact that the military judge could have called the witnesses and asked the questions himself greatly mitigates any perception of a desire to assist one side or another.

We find most of the military judge's actions that the Appellant complains of on appeal to be relatively innocuous, particularly in a judge-alone trial. The military judge was not shy about interjecting to ask his own questions of witnesses or share his thoughts with counsel, but this was generally in aid of developing the evidence in his role as the trier of fact. The fact that the evidence he developed in doing so tended to be helpful to one party or another does not, in itself, evince partiality. *See, e.g.*, *United States v. Acosta*, 49 M.J. 14, 17–18 (C.A.A.F. 1998) (finding no appearance of partiality in a court-martial with members despite the military judge asking questions that "eviscerated [the] appellant's defense of entrapment").

The military judge's comments to senior trial counsel regarding laying a foundation for Prosecution Exhibit 5 warrant an additional comment. In light of the military judge's duty to remain vigilantly impartial, and to appear so, the military judge's suggestion that he was giving a "hint" to the Government as to how to introduce evidence was ill-advised. An observer might interpret such a term to mean the military judge was choosing to assist one of the parties, despite his authority to call witnesses and ask questions himself. Nevertheless, we find that this comment, in the context of the entire trial, would not cause a reasonable observer with knowledge of all the circumstances to doubt the strong presumption the military judge was impartial.

Similarly, we find the military judge's suggestion that trial defense counsel's cross-examination of AS was "shoving words" into her mouth, which did not make the Defense "look good," also does not breach the presumption of impartiality. "[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Liteky v. United States*, 510 U.S. 540, 555 (1994). The military judge's comments do not suggest hostility toward the Defense, but merely some criticism toward trial defense counsel's cross-examination tactics. Moreover, immediately afterwards the military judge acknowledged such tactics could sometimes be effective, and then overruled the Government's objection. In addition, the context for this comment was not a tirade against the Defense, but an explanation to senior trial counsel as to why her objection to the Defense's questioning was ill-founded. Again, in the context of the entire trial, this comment would not cause an informed reasonable observer to doubt the military judge's impartiality.

Accordingly, we find the military judge's actions that Appellant cites do not, individually or collectively, reasonably call into question the military judge's impartiality. Appellant has thus failed to meet his burden to demonstrate the military judge failed to find *sua sponte* that he was disqualified from presiding at Appellant's court-martial.

**E. Sentence Severity**

**1. Law**

We review issues of sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006) (citing *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990)). We may affirm only as much of the sentence as we find correct in law and fact and determine should be approved on the basis of the entire record. Article 66(c), UCMJ, 10 U.S.C. § 866(c). "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *United States v. Sauk*, 74 M.J. 594, 606 (A.F. Ct.

Crim. App. 2015) (en banc) (alteration in original) (quoting *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009) (per curiam)). Although we have great discretion to determine whether a sentence is appropriate, we have no authority to grant mercy. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010) (citation omitted).

**2. Analysis**

Trial counsel recommended the military judge sentence Appellant to a dishonorable discharge, confinement for four years, reduction to the grade of E-1, and total forfeiture of pay and allowances. The military judge sentenced Appellant to a dishonorable discharge, confinement for seven years, reduction to the grade of E-1, and forfeiture of all pay and allowances. Appellant contends the fact that "the military judge sentenced Appellant to more confinement than requested by the trial counsel renders his sentence inappropriately severe," and requests "appropriate sentencing relief." We disagree.

Trial counsel's recommended sentence is simply that, trial counsel's recommendation; it has no binding effect on the military judge. Appellant suggests his sentence resulted from the military judge improperly using information that arose during the trial, such as emotional problems JZ experienced that were not attributable to Appellant and testimony that Appellant asserts was contrary to other evidence. However, the evidence Appellant cites was not improperly admitted, and there is no indication the military judge considered it outside its proper context. Moreover, "[m]ilitary judges are presumed to know the law and to follow it absent clear evidence to the contrary." *United States v. Rodriguez*, 60 M.J. 87, 90 (C.A.A.F. 2004) (citing *United States v. Mason*, 45 M.J. 483, 484 (C.A.A.F. 1997)). Appellant's conjectures notwithstanding, we find no basis to reach a contrary conclusion in this case.

The test for an inappropriately severe sentence rests not on trial counsel's recommendation or speculation about the military judge's thought process, but is instead based on what the record reveals about "the particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *Sauk*, 74 M.J. at 606. In this case, Appellant exploited his access to his nine-year-old stepdaughter, taking advantage of her mother's absence to hold JZ's buttocks and wrap his arms around her body with the intent to gratify his sexual desire. After AS discovered the suspicious Facebook messages, JZ was too frightened to tell investigators what Appellant had done. Nevertheless, Appellant was not dissuaded from continuing to contact JZ after the divorce, secretly sending indecent communications to the 11-year-old JZ expressing his attraction and sexual desire for her, in order to once again gratify his sexual desires. In an unsworn statement presented through her counsel, JZ described to the military judge how

Appellant's actions made her "fear the world." Appellant's offenses were serious and carried a maximum imposable punishment that included confinement for 35 years as well as a dishonorable discharge, reduction, and forfeitures. The defense sentencing case was not particularly strong; Appellant presented information about his life and career,[6] one character statement from a supervisor indicating he performed well at work, and brief telephonic testimony by Appellant's father. The military judge certainly imposed a heavy sentence, but having given individualized consideration to Appellant and all the circumstances of the case, we cannot say the sentence was inappropriately severe as a matter of law.

## F. Failure to Pay Deferred and Waived Forfeitures

On 28 January 2019, pursuant to Articles 57(a) and 58b, UCMJ, the convening authority granted Appellant's request to defer automatic forfeitures from 2 November 2018 until action, and to waive automatic forfeitures for the benefit of Appellant's dependent child until the earlier of six months or the expiration of Appellant's term of service.[7] However, in a sworn declaration dated 28 April 2020, Appellant asserted that although the required information had been provided, as of that date Appellant's pay had not been delivered in accordance with the convening authority's direction, despite the efforts of his attorneys.[8] Accordingly, Appellant requested that this court provide sentence relief pursuant to our "power and responsibility" under Article 66(c), UCMJ, 10 U.S.C. § 866(c), to "determine whether the adjudged and approved sentence is appropriate, based on a review of the entire record." *See United States v. Gay*, 74 M.J. 736, 742 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016); *United States v. Tardif*, 57 M.J. 219, 224 (C.A.A.F. 2002). In response, the Government contends the CAAF's recent decision in *United States v. Jessie*, 79 M.J. 437, 441 (C.A.A.F. 2020), precludes our consideration of Appellant's claim. We agree with the Government.

In *Jessie*, the CAAF explained the general rule "that the [Courts of Criminal Appeals] may not consider anything outside of the 'entire record' when reviewing a sentence under Article 66(c), UCMJ." *Id.* (citation omitted) (quoting *United States v. Fagnan*, 30 C.M.R. 192, 194 (C.M.A. 1961)). The CAAF explained that for purposes of Article 66, UCMJ, the "entire record" includes the

---

[6] At the time of his conviction Appellant had served less than five years in the Air Force. His service included one deployment to Afghanistan, but was somewhat marred by two letters of reprimand.

[7] The convening authority denied Appellant's request to defer his reduction in grade, an issue that is addressed in detail below.

[8] This court granted Appellant's motion to attach his declaration to the record.

"record of trial" and "matters attached to the record" in accordance with R.C.M. 1103(b)(2) and (3), as well as "briefs and arguments that government and defense counsel (and the appellant personally) might present regarding matters in the record of trial and 'allied papers.'" *Id*. at 440–41 (citing *United States v. Healy*, 26 M.J. 394, 396 (C.M.A. 1988)). Appellant's 28 April 2020 factual declaration is not part of the "entire record" as defined in *Jessie*, and is therefore presumptively outside the scope of our Article 66(c), UCMJ, review.

Appellant's reply brief raises two arguments in response. First, he contends the fact that the convening authority's decision granting the deferment and waiver is in the record gives this court "jurisdiction to consider whether the Government is complying with the convening authority's directive." The CAAF in *Jessie* recognized that "some [of its] precedents have allowed the [Courts of Criminal Appeals] to supplement the record when deciding issues that are raised by materials in the record," specifically with affidavits or hearings ordered pursuant to *United States v. DuBay*, 37 C.M.R. 411 (C.M.A. 1967) (per curiam). *Jessie*, 79 M.J. at 442. In *Jessie*, the CAAF declined to disturb this line of precedent. *Id*. at 444. However, in order to fall under this exception, we understand *Jessie* to require that the apparent or alleged *error* appears within the record of trial. It is not enough that the alleged error merely relates to a pretrial, trial, or post-trial event that is reflected in the record. Appellant's interpretation would essentially rob the general rule set forth in *Jessie* of its meaning, as seemingly any issue related to an appellant's sentence would be linked to a decision, directive, or event in the record of trial.

Second, Appellant notes that the CAAF in *Jessie* recognized an additional exception in a line of precedent "allow[ing] appellants to raise and present evidence of claims of cruel and unusual punishment and violations of Article 55, UCMJ, even though there was nothing in the record regarding those claims." *Id*. at 444. However, Appellant's assignment of error made no allegation of cruel or unusual punishment in violation of the Eighth Amendment[9] or Article 55, UCMJ; instead, it relied specifically on our Article 66(c), UCMJ, sentence appropriateness review pursuant to *Gay* and *Tardif*. Moreover, even in his reply brief Appellant entirely fails to demonstrate how the Government's failure to make a timely payment in accordance with the convening authority's deferment and waiver resulted in punishment either "'incompatible with the evolving standards of decency that mark the progress of a maturing society' or . . . 'which involve[d] the unnecessary and wanton infliction of pain.'" *United States v. Lovett*, 63 M.J. 211, 215 (C.A.A.F. 2006) (quoting *Estelle v. Gamble*, 429 U.S.

---

[9] U.S. CONST. amend. VIII.

97, 102–03 (1976)). We find Appellant's fleeting reference to the existence of an exception for the Eighth Amendment and Article 55, UCMJ, inadequate to bring his deferment and forfeiture grievance within the cruel and unusual punishment exception recognized in *Jessie*.[10]

Accordingly, we conclude that under *Jessie* we are without jurisdiction to review Appellant's allegation that the Government wrongfully failed to defer and waive his automatic forfeitures, as directed by the convening authority.

## G. Miramar Brig Policy Regarding Contact with Minors

### 1. Additional Background

In his sworn declaration dated 28 April 2020 to this court, Appellant describes how Miramar Brig policies restricting contact by sex offenders with minors have affected his ability to communicate with his son, who was born in 2017.[11] According to Appellant, Miramar Brig policies generally forbid Appellant to have contact with any minor, including his son. Appellant was able to request specific permission to have contact with his son if he met certain requirements, including *inter alia* obtaining JZ's concurrence. Without JZ's concurrence, the Miramar Brig's clinical therapist would not provide a "favorable recommendation" on the request. In addition, according to Appellant, he was told he cannot have contact with his son until he completes at least six months in the sex offender treatment program at the Miramar Brig. However, in order to enroll in the program Appellant is required to admit that he is guilty of the offenses. Furthermore, other confinees with shorter sentences than Appellant have higher priority for enrollment in the program. As a result, Appellant has not had contact with his son since he arrived at the Miramar Brig.

### 2. Law

In general, as described above in connection with the preceding issue, under Article 66(c), UCMJ, "the [Courts of Criminal Appeals] may not consider anything outside of the 'entire record' when reviewing a sentence under Article 66(c), UCMJ." *Jessie*, 79 M.J. at 441 (citation omitted). The CAAF has recognized two exceptions to this rule. First, "some [of the CAAF's] precedents have

---

[10] We do not discount the possibility that depriving an unconfined servicemember of all pay and allowances while requiring him to continue service might in some circumstances violate Article 55, UCMJ, or the Eighth Amendment. *See United States v. Jobe*, 10 C.M.A. 276, 279 (C.M.A. 1959); *United States v. Nelson*, 22 M.J. 550, 551 (A.C.M.R. 1986) (footnote and citation omitted) ("It is *per se* cruel and unusual under contemporary standards of decency . . . to deprive an officer of all pay and allowances without either subjecting him to confinement or immediately releasing him from active duty . . . ."). However, that is not Appellant's situation.

[11] AS was not the mother of Appellant's son.

allowed the [Courts of Criminal Appeals] to supplement the record when deciding issues that are raised by materials in the record." *Id*. at 442. Second, the CAAF has "allowed appellants to raise and present evidence of claims of cruel and unusual punishment and violations of Article 55, UCMJ, even though there was nothing in the record regarding those claims." *Id*. at 444.

We review de novo whether the conditions of an appellant's confinement violate the Eighth Amendment or Article 55, UCMJ. *United States v. Wise*, 64 M.J. 468, 473 (C.A.A.F. 2007) (citing *United States v. White*, 54 M.J. 469, 471 (C.A.A.F. 2001)).

"Both the Eighth Amendment and Article 55, UCMJ, prohibit cruel and unusual punishment. In general, we apply the Supreme Court's interpretation of the Eighth Amendment to claims raised under Article 55, UCMJ, except where legislative intent to provide greater protections under Article 55, UCMJ, is apparent." *Gay*, 74 M.J. at 740 (citing *United States v. Avila*, 53 M.J. 99, 101 (C.A.A.F. 2000)). "[T]he Eighth Amendment prohibits two types of punishments: (1) those 'incompatible with the evolving standards of decency that mark the progress of a maturing society' or (2) those 'which involve the unnecessary and wanton infliction of pain.'" *Lovett*, 63 M.J. at 215 (quoting *Estelle*, 429 U.S. at 102–03). To demonstrate that an appellant's confinement conditions violate the Eighth Amendment, an appellant must show:

> (1) an objectively, sufficiently serious act or omission resulting in the denial of necessities; (2) a culpable state of mind on the part of prison officials amounting to deliberate indifference to [his] health and safety; and (3) that he "has exhausted the prisoner-grievance system . . . and that he has petitioned for relief under Article 138, UCMJ, 10 USC § 938 [2000]."

*Id*. (omission and second alteration in original) (citations omitted).

### 3. Analysis

Appellant contends the Miramar Brig policies restricting his contact with his son violate his constitutional interest, protected by the Fifth Amendment[12] Due Process Clause, in the companionship and upbringing of his child. *See Troxel v. Granville*, 530 U.S. 57, 65 (2000) (citations omitted). Appellant applies the four factors articulated in *Turner v. Safley*, 482 U.S. 78, 89–91 (1987),

---

[12] U.S. CONST. amend. V.

and concludes the restrictions are not "reasonably related to legitimate penological interests." *Id*. at 89.[13] The Government responds that Appellant's declaration which forms the basis for this constitutional claim is outside the "entire record" as the CAAF explained that term in *Jessie*, and therefore this court lacks jurisdiction to consider this constitutional claim. *See Jessie*, 79 M.J. at 440–41(citation omitted).

Again, we agree with the Government. Appellant's argument is similar to the particular argument the appellant made in *Jessie*. *See id*. at 439. In *Jessie*, the appellant, who was confined at the Joint Regional Confinement Facility at Fort Leavenworth, argued a policy restricting sexual offenders from having any contact with minors, and requiring him to accept responsibility for his offenses in order to enroll in sex offender treatment, violated his First Amendment[14] and Fifth Amendment rights. *Id*. The Army Court of Criminal Appeals declined to consider the appellant's constitutional claims. *Id*. The CAAF affirmed, finding the Army court had no authority under Article 66(c), UCMJ, to consider materials from outside the record that were presented in support of these constitutional claims. *Id*. at 444. Similarly, the Miramar Brig policies of which Appellant complains in the instant case are not contained in his court-martial record. Under *Jessie*, we lack the authority to consider his 28 April 2020 declaration addressing an issue that is not in the record. *See id*. at 441–43. Accordingly, Appellant cannot prevail on these claims at this court.

However, our review of this issue is not complete. Although Appellant's assignment of error focuses on his "fundamental parental rights," and contains no analysis regarding cruel or unusual punishment or other violation of the Eighth Amendment or Article 55, UCMJ, the heading of this portion of Appellant's brief suggests the Miramar Brig policy violates Article 55, UCMJ.[15] Although we doubt that such a hollow assertion of a violation of Article 55, UCMJ,

---

[13] These factors include: (1) whether there is "a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it;" (2) "whether there are alternative means of exercising the right that remain open to prison inmates;" (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources;" and (4) "the absence of ready alternatives" to the regulation in question. *Turner*, 482 U.S. at 89–91 (citations omitted).

[14] U.S. CONST. amend. I.

[15] The heading reads in full:

> THE MIRAMAR BRIG POLICY PREVENTING APPELLANT FROM SEEING HIS TODDLER SON AND REQUIRING HIM TO ADMIT GUILT IN ORDER TO COMPLETE SEX OFFENDER TREATMENT IS UNCONSTITUTIONAL AND/OR A VIOLATION OF ARTICLE 55, UCMJ.

is sufficient to bring Appellant's claim within the second exception to the general rule explained in *Jessie*, and thereby enable us to consider Appellant's declaration, *see id*. at 444, we will assume *arguendo* that it does so.

We find Appellant's claims to be entirely insufficient to warrant relief under Article 55, UCMJ. Appellant's declaration implicates none of the specific prohibitions enumerated in the article: flogging, branding, marking, tattooing, or the improper use of irons. *See* 10 U.S.C. § 855. As for the article's prohibition on "other cruel or unusual punishment[s]," *id*., we "apply the Supreme Court's interpretation of the Eighth Amendment." *Gay*, 74 M.J. at 740 (citation omitted). Appellant fails to demonstrate punishment "'incompatible with . . . evolving standards of decency,'" "'unnecessary and wanton infliction of pain,'" or an "act or omission resulting in the denial of necessities." *Lovett*, 63 M.J. at 215 (footnote omitted) (quoting *Estelle*, 429 U.S. at 102–03). Accordingly, even if this court could consider his 28 April 2020 declaration with regard to this issue, Appellant would be entitled to no relief.

In reaching our conclusions, we make no judgment as to the merits of Appellant's constitutional claims. Appellant may have recourse to courts with the authority to address these claims. However, under *Jessie*, this court is not one of them.

## H. Denial of Request to Defer Reduction in Grade

### 1. Additional Background

Appellant was sentenced on 19 October 2018. On 7 November 2018, Appellant requested through counsel that the convening authority defer the adjudged reduction in grade pursuant to Article 57(a)(2), UCMJ, and R.C.M. 1101(c) until action, and that the convening authority waive automatic forfeitures for a period of six months pursuant to Article 58b(b), UCMJ, for the benefit of Appellant's dependent son. The special court-martial convening authority (SPCMCA) and his staff judge advocate (SJA) both recommended approval of the requested deferment and waiver. On 7 January 2019, Appellant, through counsel, supplemented this request with additional information, and clarified that he sought deferment of the automatic forfeitures in addition to deferment of the reduction in grade. On 24 January 2019, the convening authority's SJA recommended approval of the requested deferment of the reduction and forfeitures as well as the waiver of forfeitures in order "[t]o maximize assistance to [Appellant's] son." A copy of this recommendation, as well as a draft memorandum for the convening authority's signature approving the entire deferment and forfeiture request, was attached to the copy of the SJA's recommendation also dated 24 January 2019 which was served on the Defense.

On 28 January 2019, the convening authority deferred the automatic forfeitures until action, and waived the automatic forfeitures for the benefit of

Appellant's dependent son for a period of six months, expiration of Appellant's term of service, or Appellant's release from confinement, whichever occurred first, with the waiver commencing on the date of action. However, the convening authority denied the requested deferment of reduction in rank, and he did not provide any reason or explanation for the denial. The record does not reflect that the convening authority's decision denying the requested deferment of reduction of rank was served on Appellant.

The convening authority approved the adjudged sentence on 15 February 2019.

**2. Law**

Article 57(a)(2), UCMJ, authorizes a convening authority, upon application by the accused, to defer a forfeiture of pay or allowances or a reduction in rank until the date the convening authority takes action on the sentence. R.C.M. 1101(c)(3) provides that an accused seeking to have a punishment deferred "shall have the burden of showing that the interests of the accused and the community in deferral outweigh the community's interests in imposition of the punishment on its effective date." The rule outlines several factors which the convening authority may consider in determining whether to grant the request, including *inter alia* the nature of the offenses, the sentence adjudged, the effect of deferment on good order and discipline in the command, and the accused's character, mental condition, family situation, and service record.

We review a convening authority's denial of a deferment request for an abuse of discretion. *United States v. Sloan*, 35 M.J. 4, 6 (C.M.A. 1992) (citing R.C.M. 1101(c)(3)), *overruled on other grounds by United States v. Dinger*, 77 M.J. 447, 453 (C.A.A.F. 2018). "When a convening authority acts on an [appellant]'s request for deferment of all or part of an adjudged sentence, the action must be in writing (with a copy provided to the [appellant]) and must include the reasons upon which the action is based." *Id.* at 7 (footnote omitted); *see also* R.C.M. 1101(c)(3), Discussion ("If the request for deferment is denied, the basis for the denial should be in writing and attached to the record of trial.").

Failure to timely comment on matters in or attached to the SJAR forfeits a later claim of error; we analyze such forfeited claims for plain error. *United States v. Zegarrundo*, 77 M.J. 612, 613 (A.F. Ct. Crim. App. 2018) (citations omitted). "To prevail under a plain error analysis, [an appellant] must persuade this Court that: '(1) there was an error; (2) it was plain or obvious; and (3) the error materially prejudiced a substantial right.'" *United States v. Scalo*, 60 M.J. 435, 436 (C.A.A.F. 2005) (quoting *Kho*, 54 M.J. at 65) (additional citation omitted).

**3. Analysis**

Under *Sloan*, the convening authority's failure to state his reasons for denying the requested deferment of Appellant's adjudged reduction in rank was an error. *See* 35 M.J. at 7. Because the record does not reflect that the convening authority's decision was attached to the SJA's recommendation or otherwise provided to the Defense prior to Appellant's clemency submission, we find Appellant has not forfeited the error.[16] *See Zegarrundo*, 77 M.J. at 613 (citations omitted).

The Government concedes the error, but contends Appellant is entitled to no relief in the absence of some evidence that the convening authority acted for an improper reason. *See, e.g.*, *United States v. Winn De Leon*, No. ACM S32544, 2019 CCA LEXIS 396, at *8 (A.F. Ct. Crim. App. 9 Oct. 2019) (unpub. op.); *United States v. Jalos*, No. ACM 39138, 2017 CCA LEXIS 607, at *6 (A.F. Ct. Crim. App. 5 Sep. 2017) (unpub. op.); *United States v. Eppes*, No. ACM 38881, 2017 CCA LEXIS 152, at *43 (A.F. Ct. Crim. App. 21 Feb. 2017) (unpub. op.), *aff'd*, 77 M.J. 339 (C.A.A.F. 2018).[17] However, in this case several factors lead us to conclude that relief is warranted under the circumstances.

---

[16] Appellant did not raise this error in his initial assignments of error. After our review of the record, this court issued an order to the Government to show good cause as to why this court should not grant appropriate relief. The Government submitted a timely response to the order, and at the court's invitation Appellant submitted his own response to the show cause order and to the Government's brief. In his brief, Appellant contends he was unaware that the convening authority had denied the deferment of the reduction until 2 May 2020, when he received a copy as a result of filing an inspector general complaint related to the Government's failure to provide pay in accordance with the deferred and waived forfeitures (see Section II.F., *supra*). Thus, Appellant indicates he was unaware of this denial until after he submitted his initial assignments of error, although before he submitted his reply brief to the Government's answer. Our own review of the record and the Government's erroneous statement in its answer that the convening authority *had* approved the deferment of the reduction both lend some plausibility to this claim; however, Appellant has not provided a factual *declaration* that he was unaware of the denial. In light of our resolution of this issue, we find it unnecessary to further examine whether Appellant was misled as to the status of his request for deferment of the reduction. It is enough that, unlike the SJA's recommendation and draft approval of the deferment, the record discloses no evidence that the convening authority's denial was provided to the Defense.

[17] We recognize that these and other unpublished opinions of this court quoted our sister court's published opinion in *United States v. Zimmer*, 56 M.J. 869, 874 (A. Ct. Crim. App. 2002), with approval, and thereby implied that a credible showing of an improper or unlawful reason is a prerequisite to relief for a *Sloan* error. However, no authority binding on this court has made such a holding, and our recent decision in *United States v. Ward*, No. ACM 39648, 2020 CCA LEXIS 305, at *7–13 (A.F. Ct. Crim. App. 3 Sep. 2020) (unpub. op.), declined to apply this particular reasoning in *Zimmer*.

First, the convening authority's decision with respect to deferring the reduction was contrary to the recommendation of the SPCMCA, the SPCMCA's SJA, and the convening authority's own SJA. We particularly note the two SJAs, who we may presume to be familiar with the applicable law, including Appellant's burden to demonstrate that deferment is appropriate and the factors the convening authority should consider under R.C.M. 1101(c)(1), agreed the convening authority should approve the request.

Second, and relatedly, the record does not indicate the convening authority was advised of the factors enumerated in R.C.M. 1101(c)(1) to guide his decision. Notably, Appellant's request for deferment, the SPCMCA SJA's legal review, and the convening authority SJA's legal review all cite Article 57(a)(2), UCMJ, in order to explain the nature of the request, but none cite the specific guidance in R.C.M. 1101(c)(1).

Third, in contrast to the situation in our recent decision in *United States v. Ward*, No. ACM 39648, 2020 CCA LEXIS 305, at *7–13 (A.F. Ct. Crim. App. 3 Sep. 2020) (unpub. op.), the Government has not provided a sworn declaration from the convening authority explaining his decision to deny the request. Although, as we noted in *Ward*, "such *post facto* explanations may, even if unconsciously, be influenced by the benefit of hindsight," *id.* at *11–12 (citations omitted), they nevertheless provide some evidence relevant to determining whether the convening authority abused his discretion. The continued absence of any explanation for the convening authority's decision in this case weighs in favor of granting relief.

Under the particular circumstances of this case, we conclude Appellant has been prejudiced by the convening authority's failure to explain his reasons for denying the requested deferment of the reduction in grade. Appellant was entitled to have this court review the convening authority's decision for an abuse of discretion. As our superior court explained in *Sloan*, "[j]udicial review is not an exercise based upon speculation, and we will not permit convening authorities to frustrate the lawful responsibility of the [military appellate courts] . . . ." 35 M.J. at 6–7. In this case, where not only has the convening authority not explained his decision, but he acted contrary to the unanimous advice of the SPCMCA and two senior judge advocates, and the record discloses no indication that the convening authority was advised of appropriate considerations under R.C.M. 1101(c)(1), we conclude that under *Sloan* we cannot approve the convening authority's decision without abandoning our "lawful responsibility" to review the decision for an abuse of discretion.

We pause to clarify what we are not deciding here. We do not hold that the convening authority actually abused his discretion by denying the deferment of the reduction, or that he was required to follow the advice of the SJA or anyone else. The error here is not the decision to deny the request; the error is

the failure to explain the decision, as *Sloan* requires, which has prejudiced Appellant's right to have the decision reviewed on appeal.

We have considered remanding the record for additional post-trial processing and consideration by the convening authority. However, under the circumstances, we conclude a different remedy is appropriate. We considered that, had events followed their proper course, Appellant would have been served with notice of the denial and the reasons given before he submitted his clemency request. We considered the practical difficulties of requiring a convening authority to, in effect, review decisions previously made for an abuse of discretion. Furthermore, we have considered the length of the post-trial and appellate proceedings in this case to date. We conclude that, in light of the previously-granted waiver of automatic forfeitures, approving a reduction to the grade of E-3 rather than the grade of E-1 will adequately moot any prejudice resulting from the error. *See United States v. Zimmer*, 56 M.J. 869, 875 (A. Ct. Crim. App. 2002); *see also United States v. Wheelus*, 49 M.J. 283, 288 (C.A.A.F. 1998) ("[T]he Courts of Criminal Appeals have broad power to moot claims of prejudice by 'affirming only such findings of guilty and the sentence or such part or amount of the sentence, as it finds correct in law and fact and determines, on the basis of the entire record, should be approved.'" (quoting 10 U.S.C. § 866(c))).

## I. Post-Trial Delay

### 1. Additional Background

Appellant was sentenced on 19 October 2018, and the convening authority took action on 15 February 2019. Appellant's case was docketed with this court 34 days later, on 21 March 2019.

Appellant's civilian appellate defense counsel entered a notice of appearance on his behalf on 6 May 2019. Appellant's assignments of error were originally due on 20 May 2019. Appellant requested and was granted 11 enlargements of time to file his assignments of error, which he submitted on 28 April 2020. The Government submitted a timely answer on 28 May 2020, without requesting an enlargement of time. Appellant submitted a reply to the Government's answer on 16 June 2020, after requesting and being granted a five-day enlargement of time.

On 14 September 2020, this court issued a show cause order with respect to the convening authority's failure to state his reasons for denying Appellant's request for a deferment of his reduction in grade, an issue that was not addressed in the parties' briefs, as described above. The Government filed a timely response on 25 September 2020, and Appellant submitted his reply on 2 October 2020.

Appellant has not made a demand for timely post-trial review or appeal.

**2. Law**

"We review de novo claims that an appellant has been denied the due process right to a speedy post-trial review and appeal." *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citing *Rodriguez*, 60 M.J. at 246; *United States v. Cooper*, 58 M.J. 54, 58 (C.A.A.F. 2003)). In *Moreno*, the CAAF established a presumption of facially unreasonable delay when the convening authority does not take action within 120 days of sentencing, when the case is not docketed with the Court of Criminal Appeals within 30 days of action, and when the Court of Criminal Appeals does not render a decision within 18 months of docketing. 63 M.J. at 142. Where there is such a delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice [to the appellant]." *Moreno*, 63 M.J. at 135 (citing *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005); *Toohey v. United States*, 60 M.J. 100, 102 (C.A.A.F. 2004)). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* at 136 (citing *Barker*, 407 U.S. at 533).

**3. Analysis**

Appellant's record was not docketed with this court until 34 days after the convening authority's action, exceeding the *Moreno* standard for a facially unreasonable delay by four days. In addition, this court did not issue its opinion within 18 months of docketing, exceeding the *Moreno* standard. Accordingly, we have considered the *Barker* factors to assess whether Appellant's due process right to timely review has been infringed.

However, the CAAF has held that where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). In *Moreno*, the CAAF identified three types of cognizable prejudice for purposes of an appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of the appellant's ability to present a defense at a rehearing. 63 M.J. at 138–39 (citations omitted). In this case, we find no oppressive incarceration because Appellant's appeal has not resulted in any reduction in his term of confinement. Similarly, where the appeal does not result in a rehearing on findings or sentence, Appellant's ability to present a defense at a rehearing is not impaired. *Id.* at 140. As for anxiety and concern, the CAAF has explained "the appropriate test for the military justice system is to require an appellant to show particularized anxiety or concern that is distinguishable from the nor-

mal anxiety experienced by prisoners awaiting an appellate decision." *Id*. Appellant has not asserted such particularized anxiety caused by delay in this case, and we discern none. We acknowledge Appellant has expressed concern over the Government's failure to provide pay for his dependents in accordance with the convening authority's deferment and waiver of the mandatory forfeitures, but as we explained above, under *Jessie*—which the CAAF decided before Appellant filed his assignments of error—this court is without jurisdiction to remedy that asserted error. Accordingly, we do not find any delay in the issuance of this court's opinion contributed to particularized anxiety within the meaning of *Moreno* with respect to that issue.

The action-to-docketing delay in this case exceeded the 30-day *Moreno* standard by only four days. We note the record is of substantial size, comprised of ten volumes including 969 pages of transcript, and was required to be shipped in multiple copies from Europe to Joint Base Andrews, Maryland. We cannot say this relatively short facially unreasonable delay was so egregious as to undermine confidence in the military justice system.

We are even less troubled by the delay between docketing and the issuance of this court's opinion. The vast majority of the delay was attributable to the defense requests for enlargement of time submitted by or on behalf of Appellant's civilian appellate defense counsel. By the time Appellant filed his assignments of error, more than 13 months had elapsed from the date of docketing. The Government filed a timely answer, without requesting a delay, addressing nine issues Appellant raised on appeal. In addition, this court determined a show cause order and additional briefs from the parties were appropriate to address an additional issue Appellant did not initially raise, but for which he requested relief once it was identified by the court. Moreover, this court is issuing its opinion within two months of the 18-month *Moreno* standard. Considering the totality of the circumstances, we find no violation of Appellant's due process rights.

Recognizing our authority under Article 66(c), UCMJ, we have also considered whether relief for excessive post-trial delay is appropriate even in the absence of a due process violation. *See Tardif*, 57 M.J. at 225. After considering the factors enumerated in *Gay*, 74 M.J. at 744, we conclude it is not.

## III. CONCLUSION

We affirm only so much of the sentence as provides for a dishonorable discharge, confinement for seven years, and reduction to the grade of E-3. The approved findings and sentence, as modified, are correct in law and fact, and no other error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accord-

ingly, the findings and modified sentence are **AFFIRMED**. We direct the publication of a new court-martial order in accordance with our decretal paragraph.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court